SAMUEL YANOW, RESHELA YANOW, HERBERT D. MYRTLE, GERTRUDE E. MYRTLE, ABRAHAM T. HOROWITZ, RUTH S. HOROWITZ, PLAINTIFFS, v. SEVEN OAKS PARK, INC., A NEW JERSEY CORPORATION, MAX MASIN, MORRIS TZESES, SEYMOUR MASIN, LEO TZESES AND MILTON ALPERT, DEFENDANTS, AND EASTERN CHRISTIAN INSTITUTE, A NEW JERSEY CORPORATION, INTERVENING-DEFENDANT-RESPONDENT, CITY OF ORANGE, CROSS-CLAIMANT-APPELLANT.

Argued December 15, 1952—Decided January 26, 1953.

342

344

*Mr. Edmond J. Dwyer* argued the cause for the appellant, City of Orange.

*Mr. Edward R. McGlynn* argued the cause for the respondent, Eastern Christian Institute (*Mr. Charles E. Garrett* on the brief; *Messrs. McGlynn, Weintraub & Stein,* attorneys).

The opinion of the court was delivered by

BURLING, J.   This civil action was instituted by one Samuel Yanow and others, residents of properties fronting upon Seven Oaks Road in the City of Orange, Essex County, New Jersey, against Seven Oaks Park, Inc., and others, for various measures of relief, including prayers for specific performance of alleged representations or agreements between the plaintiffs and the defendant Seven Oaks Park, Inc.   The principal object of the suit appears to have been to prevent the consummation of a sale (agreement for which sale was entered into on November 1, 1950) by the defendants, or some of them, to Eastern Christian Institute (hereinafter referred to as Eastern), a New Jersey corporation, of premises consisting of a three-acre plot of ground improved by a three-story brick building, together with accessory buildings, situated on South Center Street in the City of Orange.   The main structure, containing 23 rooms and 13 baths had been constructed for use as a residence.   It was known locally as the "Colgate House."   Eastern intervened in this action as a defendant.   The plaintiffs filed an amended complaint invoking the protection of the municipal zoning ordinance,

and on the strength thereof as well as upon the other allegations of their complaint sought injunctive relief against the use Eastern was alleged to have proposed to make of the said Colgate House property.

Eastern had been incorporated in New Jersey in September 1946, as a non-profit institution for the purpose of post-high school "specialized religious training" for the ministry and missionary work, without denominational affiliation. At the time of the trial of the cause, the school had removed from its former location (it had used the facilities of the Central Christian Church, East Orange) to the Colgate House and had there proceeded to instruct its students, nine of whom were boarded there. The ultimate plan was to accommodate at least 50 students. The school also had a teaching staff consisting of two full-time teachers and five part-time instructors.

The evidence in the record shows that the surrounding area is one of one-family homes, with the exception of an apartment house constructed "across the street" from the Colgate property, admitted by Eastern to have been constructed after a grant of a variance therefor. Eastern does not contest the assertion of the City of Orange on this appeal that this area constitutes "the best residential section of the city," which appears to have been Eastern's own characterization thereof and was contained in its own brochure, which was introduced in evidence. Eastern introduced no evidence to the contrary.

The defendants by cross-claim sought specific performance of the agreement of sale, hereinabove adverted to, by Eastern. The City of Orange (hereinafter referred to as the City) was permitted to intervene in the cause, by order of the Superior Court, Chancery Division, entered August 10, 1951, and by its answer and cross-claim, relying upon its zoning ordinance, sought a judgment restraining and enjoining Eastern and the other defendants "from using or permitting the use of the aforesaid Colgate House for any purpose other than that of a one-family residence." Eastern by answer

thereto asserted several alleged separate defenses against the City's cross-claim, including attacks upon the constitutionality of sections 2(a)(4) and 2(a)(9) of the City's zoning ordinance.

The ordinance in question was passed on May 11, 1922. The provisions thereof above adverted to are included in the following portion thereof:

"Sec. 2 (a) Within any Residence 'A' District, as indicated on the Building Zone Map, no building shall be erected and no building or premises shall be used for any business or industry permitted in Sections 5 and 6 of this ordinance, nor for other than one or more of the following specified purposes:

(1) A dwelling for one family or for one housekeeping unit only provided that nothing herein shall prevent the taking of roomers or boarders.

(2) The office or studio of a · professional person residing on the premises, provided there is no display of goods or advertising.

(3) Municipal playgrounds, parks or recreation buildings.

(4) Public and Parochial Schools.

(5) Churches and other places of worship, parish houses, Sunday school buildings.

(6) Farms, truck gardens, nurseries or greenhouses, excepting those used primarily for the growing of vegetables, plants or flowers to be sold at wholesale and, provided that there is no display of products and no advertising and provided that there is no power plant and that any greenhouse heating plant is at least twenty feet distant from each side lot line and also from the rear lot line of a corner lot.

(7) Accessory uses, customary or incident to the above uses and located on the same lot . with them. Except as provided above, 'accessory uses' shall not include any uses customarily carried on as a business or as an industry, nor any driveway or walk giving access thereto, nor any structure used as a billboard or advertising sign.

(8) A private garage, only on the same lot with the building to which it is accessory, in which no business, service or industry connected directly or indirectly with motor vehicles is carried on. No such garage shall provide storage for more than one motor vehicle for each 20 feet of frontage of the lot on one street only, nor for more than one vehicle for each 2500 square feet of lot area, nor for more than five motor vehicles in any case, of which not more than one vehicle may be a commercial vehicle of not more than one and one half tons weight or capacity. Space for two cars may be provided in any case. Space for not more than one non-commercial vehicle may be leased. Such private garage shall be everywhere distant at least 25 feet from each street line. The same regulation as for private garages shall apply also to private stables except that one horse

and one vehicle shall be considered to be the equivalent of one motor vehicle.

(9) Private schools, clubs, lodges, social community center and recreation buildings, are prohibited, unless the written consents of 80 per cent., by frontage, of the owners of all lots within 200 feet of the property in question be filed with the Building and Plumbing Inspector, and unless every application for the erection, enlargement or alteration of any such building shall be approved by the Board of Appeals."

Although our analysis of this case does not require resort thereto, it is noted in passing that the provision for private boarding contained in section 2(a)(1) of the zoning ordinance, *supra*, was deleted by an amendment to the zoning ordinance passed January 4, 1949.

The trial court *inter alia* found that the "delegation by the City of Orange of a legislative power vested in it without fixing standards for the exercise thereof is unlawful" and that the "ordinance vested an unlawful discrimination between a private and public or parochial school" and entered judgment in favor of the defendants as against the plaintiffs, in favor of the original defendants against Eastern (*i. e.*, requiring Eastern specifically to perform its agreement to purchase the Colgate House), and against the intervening-defendant City, dismissing its cross-claim against Eastern for injunctive relief to enforce the provisions of the City's zoning ordinance. The City appealed from the latter portion of the judgment (no other party appealed) to the Superior Court, Appellate Division. Before hearing there certification was allowed upon our own motion.

The questions involved on this appeal call upon us to determine the constitutionality of the application of the Orange zoning ordinance, *supra*, to Eastern's property, the Colgate House. The question whether clause 2(a)(9) of the zoning ordinance is "invalid under the State and Federal Constitutions" because "the delegation therein of legislative power to adjacent landowners, coupled with a lack of standards for its exercise, is unconstitutional" was litigated in the court below and determined adversely to the City, but this

determination (in which we concur) is not questioned by the City on this appeal but is admitted by it to be correct.

The gist of the arguments presented on this appeal reduces the questions involved to three phases:

(1) The construction or application of section 2(a) of the zoning ordinance after excision of clause (9) therefrom;

(2) Whether section 2(a) without clause (9) excludes a school of the category of that operated by Eastern and whether the ordinance in that respect is unconstitutional;

(3) If the ordinance as construed to exclude Eastern's school is constitutional, does section 2(a) fall by virtue of the invalidity of clause (9) thereof, in other words is the zoning ordinance severable in this respect?

## I.

Our first inquiry in the search for the answers to these questions is, what was the legislative intent expressed in section 2(a), clause (4), of the zoning ordinance, *supra*, which denominated as permitted uses "Public and Parochial Schools"? We conclude that the intent expressed was to permit such schools as are required for the good of the residential area, namely those established for the general education of the children of the neighborhood in the subjects and classes necessary to compliance with the state compulsory education laws, but to exclude institutions of higher or specialized education.

The ordinance was passed on May 11, 1922, and it is to that point in time to which we must direct our attention to determine the legislative intent. As Mr. Justice Heher stated in *Crater v. County of Somerset*, 123 *N. J. L.* 407, 413 (*E. & A.* 1939):

"* * * we are under a duty to refer to the history of the times 'to ascertain the reason for, and the meaning of the provisions of a statute, and to the general state of opinion, public, judicial and legislative, at the time of the enactment. * * *' *Endlich on the Interpretation of Statutes*, § 29."

There is a considerable body of pertinent legislation of which we may take cognizance in this case. This legislation was gathered together in the General School Law, Revision of 1903, as amended and supplemented (4 *C. S.* 1910, *p.* 4724 *et seq.*). These statutory provisions did not separately define the term "public school," but the various provisions detail a definite plan of local schools designed for general education of persons over 5 and under 20 years of age (see 4 *C. S.* 1910, *p.* 4765, *sec.* 116), referring to educational periods commonly known as elementary (grammar) and intermediate · (high) school. This plan is apparent in the text of the provision relating to compulsory school attendance of children between the ages of 7 and 17 inclusive (4 *C. S.* 1910, *pp.* 4775–4776, *sec.* 153), clearly classifying elementary (grammar), intermediate (high) and manual training schools as "public schools." The foregoing statutory law was subjected to various amendments, but the legislative scheme remained the same (for example see the subsequent enactments relative to compulsory attendance, as contained in *L.* 1914, *c.* 223, *sec.* 2, as amended *L.* 1919, *c.* 35, *sec.* 1, *L.* 1931, *c.* 307, *sec.* 1; and see also *R. S.* 18:14–14, as amended *L.* 1940, *c.* 154, *p.* 346, *sec.* 1, *N. J. S. A.* 18:14–14).

█ Our conclusions in this respect find support in authority in other jurisdictions. The weight of such authority declares that the phrase "public schools" is not applied to the "higher seminaries of learning" such as academies and colleges, but relates to general elementary (grammar) and intermediate (high) schools, *In re Townsend*, 195 *N. Y.* 214, 88 *N. E.* 41, 43–44, 22 *L. R. A., N. S.,* 194 (*Ct. App.* 1909); *In re Opinion of the Justices*, 214 *Mass.* 599, 102 *N. E.* 464 (*Sup. Jud. Ct.* 1913); nor is the phrase inclusive of "technical and professional schools, and other institutions of learning which do not cover substantially the same field" as those designed for the compulsory education of children, *Commonwealth v. Connecticut Valley St. Ry. Co.*, 196 *Mass.* 309, 82 *N. E.* 19, 20, 21 (*Sup. Jud. Ct.* 1907). *Cf. Board Regents Normal School Dist. No. 3 v. Painter*, 102 *Mo.* 464,

14 *S. W.* 938, 940, 10 *L. R. A.* 493 (*Sup. Ct.* 1890) ; *Regents of University of Oklahoma v. Board of Education,* 20 *Okl.* 809, 95 *P.* 429, 432 (*Sup. Ct.* 1908) ; *Elsberry v. Seay,* 83 *Ala.* 614, 3 *So.* 804, 806 (*Sup. Ct.* 1888). More recent authority is to the same effect. See *Lynch v. Commissioner of Education,* 317 *Mass.* 73, 56 *N. E.* 2d 896, 899 (*Sup. Jud. Ct.* 1944) ; *Rankin v. Love,* —— *Mont.* ——, 232 *P.* 2d 998, 1000–1001 (*Sup. Ct.* 1951) ; *Pollitt v. Lewis,* 269 *Ky.* 680, 108 *S. W.* 2d 671, 113 *A. L. R.* 691 (*Ct. App.* 1937).

▮ Parochial schools, as the term is used in this ordinance, connote private schools, at which schools (in addition to religious instruction) students are given courses of study sufficient to qualify attendance thereat as compliance with compulsory education requirements. See *R. S.* 18:19–7. Thus they are in the juridical concept schools conducted by a religious order, but which provide grammar and high school training in accord with statutory requirements. They are therefore in the same general category as public schools for zoning purposes and are so grouped in the ordinance. *Cf. In re Townsend, supra* (88 *N. E.,* at *p.* 44). This juridical concept is not new but has its foundation in our common law. The parish was known to the common law as a jurisdictional division of territory, *Blackstone's Commentaries* (*Browne's ed.* 1897), *p.* 33; it had (through its governing body) the duty to keep its own highways in repair (although bridges were maintained by the county), *Id. p.* 116; the parish appointed overseers of the poor, *Ibid.* ; parish clerks and sextons had "freeholds in their office," *Id. p.* 128; and the law relating to illegitimate children and their support recognized the parish as the local jurisdictional authority, *Id. p.* 152, 609.

▮ A legislative body in this State is presumed to be familiar not only with the statutory law of the State, but also with the common law. *Ross v. Miller,* 115 *N. J. L.* 61, 63 (*Sup. Ct.* 1935). In its generic legal sense, "parish" did not denote any specific religious faith or denomination at the common law, and the State Legislature clearly has not

confined its meaning in the provisions of the school laws hereinbefore adverted to. Nor did the municipal governing body in the ordinance in question. "Parochial" means "of or pertaining to a parish," or confined or restricted to a parish. See 31 *Words & Phrases, p.* 100; 67 *C. J. S., p.* 876. Further, the word "parish" is used in clause 2(a)(5) of the ordinance, *supra*, as applicable to all churches (*viz.*, "churches and other places of worship, parish houses, Sunday school buildings"), and not merely to one particular religious order or denomination.

Therefore we have concluded that the sense in which the phrase "Public and Parochial Schools" was used in this ordinance includes elementary (grammar) and intermediate (high) schools, whether operated by the State or a religious organization, for the *principal* purpose of education of children of the community in those subjects or courses required under the statutes relating to compulsory education and religious instruction also in the case of parochial schools. It does not include trade or professional schools, colleges, seminaries or universities, which are excluded from the "A" residence district by the ordinance before us in view of the phraseology of section 2(a) thereof.

## II.

(A) It is suggested by the respondent that the ordinance in question discriminates against all *private* schools not conducted by a religious body. Inasmuch as the respondent's school comes within the category of higher or special education, and not elementary (grammar) or intermediate (high) school education, this question is not before us.

(B) The principal issue in this case is whether a municipality under any circumstances may constitutionally so zone a residential area that schools of higher education, or specialty schools (trades, professions, social arts and activities, *etc.*) are excluded. We render our decision on this phase of the appeal in the affirmative.

352

Persons are guaranteed the rights "of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." *N. J. Const.* 1947, *Art. I, par.* 1. But our State Constitution also recognizes "zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to * * * the nature and extent of their use, * * *" as being "within the police power of the State," *N. J. Const.* 1947, *Art. IV, Sec. VI, par.* 2, and requires liberal construction of the "provisions of this Constitution and of any law concerning municipal corporations formed for local government" in favor of the municipality, "not inconsistent with or prohibited by this Constitution or by law." *N. J. Const.* 1947, *Art. IV, Sec. VII, par.* 11. Eastern asserts that these provisions are contravened by the exclusion of its educational institution from the residential area in question, and that it is also protected by the "due process" and "equal protection" clauses of the 14th Amendment to the Constitution of the United States.

■ Although the ordinance in question was enacted in 1922 and we therefore have looked to that time for enlightenment as to the *intent* of the municipal governing body exhibited in the words used in the enactment, *validity* of the provisions thereof are governed not only by the provisions of our Federal and State Constitutions, hereinabove adverted to, but also by *N. J. Const.* 1844, *Art. IV, Sec. VI, par.* 5 (as added, election September 20, 1927; proclamation October 18, 1927) and the statute enacted thereunder (*L.* 1928, *c.* 274) in view of the provisions of *L.* 1928, *c.* 274, *sec.* 7, *p.* 698 now incorporated in *R. S.* 40:55–51, which validated prior existing ordinances "except in so far as they are inconsistent with" said statute. See *Steinberg v. Board of Adjustment &c.*, 106 *N. J. L.* 603 (*E. & A.* 1929); *Paramount Realty, &c. Co. v. Schmitt*, 106 *N. J. L.* 587 (*E. & A.* 1929); *Koplin v. South Orange*, 6 *N. J. Misc.* 489 (*Sup. Ct.* 1928), affirmed 105 *N. J. L.* 492 (*E. & A.* 1929).

The applicable statutory provision therefore is *L.* 1928, *c.* 274, *sec.* 5, *p.* 697 now incorporated in *R. S.* 40:55–32, which reads:

"5. Purposes in view. Such regulations shall be made in accordance with a comprehensive plan and designed for one or more of the following purposes: To lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health, morals or the general welfare; to provide adequate light and air; to prevent the overcrowding of land or buildings; to avoid undue concentration of population. Such regulation shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."

In *Euclid, Ohio, v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 118, 71 *L. Ed.* 303 (1926), Mr. Justice Sutherland expressed the principles that "* * * If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control" (272 *U. S.* 365, 47 *S. Ct.,* at *page* 118, 71 *L. Ed.,* at *page* 311), and that although an exclusion forbidding uses in general terms may exclude uses which in themselves are "innocuous" and "neither offensive nor dangerous," this does not alone invalidate the ordinance; and "Such laws may also find their justification in the fact that, in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation. * * * It cannot be said that the ordinance in this respect 'passes the bounds of reason and assumes the character of a merely arbitrary fiat' * * *." (272 *U. S.* 365, 47 *S. Ct.,* at *page* 118, 71 *L. Ed.,* at *page* 311). *Cf. Monmouth Lumber Co. v. Ocean Township,* 9 *N. J.* 64, 78 (1952); *Schmidt v. Board of Adjustment, Newark,* 9 *N. J.* 405, 416 (1952).

Mr. Justice Sutherland in the *Euclid* case, *supra,* collected the views of courts and of commissions and experts, summarizing their views as follows:

"* * * the segregation of residential, business and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; * * * will increase the safety and security of home life; greatly tend to prevent street accidents, especially to children, by reducing the traffic and resulting confusion in residential sections; decrease noise and other conditions which produce or intensify nervous disorders; preserve a more favorable environment in which to rear children * * *" and "* * · * development of detached house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover the coming of one apartment house is followed by others, interfering by their height and bulk with the free circulation of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bringing, as their necessary accompaniments, the disturbing noises incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities, —until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. * * *"

And concluding:

"If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions * * * the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." (See 272 *U. S.* 365, 45 *S. Ct.* at *page* 120, 71 *L. Ed.* at *pages* 313–314)

*Cf. Schmidt v. Board of Adjustment, Newark, supra* (9 *N. J.,* at *pp.* 414–415); *Lionshead Lake, Inc. v. Township of Wayne,* 10 *N. J.* 165, 172–173 (1952).

In a situation somewhat analogous to the matter before us, the exclusion of dormitories of educational institutions for the mentally deficient from a residence district where dormitories and schools for normal students are permitted has been held in Pennsylvania not to create an invalid discrimina-

tion. *Application of Devereux Foundation,* 351 *Pa.* 478, 41 *A. 2d* 744, 746 (*Sup. Ct.* 1945), appeal dismissed for want of a substantial federal question, 326 *U. S.* 686, 66 *S. Ct.* 89, 90 *L. Ed.* 403 (1945).

Eastern has cited decisions of courts in other jurisdictions as support for its contention that the law should be settled in its favor. We find these decisions and others of like import to be readily distinguishable and not dispositive.

*Catholic Bishop of Chicago v. Kingery,* 371 *Ill.* 257, 20 *N. E. 2d* 583 (*Sup. Ct.* 1939), is not opposed to our conclusions, for the rationale of the decision there was that where public schools were permitted the exclusion of a parochial school *of like category* was unreasonable. Compare *Roman Catholic Archbishop v. Baker,* 140 *Ore.* 600, 15 *P. 2d* 391 (*Sup. Ct.* 1932). To the same effect is *City of Miami Beach v. State ex rel. Lear,* 128 *Fla.* 750, 175 *So.* 537, 539 (*Sup. Ct.* 1937), which related to a multiple dwelling zone.

*Western Theological Seminary v. City of Evanston,* 325 *Ill.* 511, 156 *N. E.* 778, 784 (*Sup. Ct.* 1927), is distinguishable from the case before us upon the facts. There the plaintiff acquired property in a residential zone for the avowed purpose of constructing a theological seminary (including a dormitory for the accommodation of 56 students). The zoning ordinance at that time permitted colleges. Subsequently the City of Evanston amended the ordinance to exclude colleges, and denied Western a permit for its contemplated construction. The Illinois court found that two such institutions had existed in the zone "for many years," and that there was no showing of any change in conditions to warrant the new exclusion. The court expressly stated "The question of the right of the city to exclude from the A district schools and colleges in the first instance does not call for decision." These conclusions were reiterated in the opinion of the Illinois Supreme Court in *Western Theological Seminary v. City of Evanston,* 331 *Ill.* 257, 162 *N. E.* 863, 864 (*Sup. Ct.* 1928), wherein it was concluded that the evidence "* * * does not present a

change of circumstances sufficient to show that the provision of the ordinance of 1927 excluding dormitories from 'A' residence district should apply to appellee and its property."

*Langbein v. Board of Zoning Appeals*, 135 *Conn.* 575, 67 *A. 2d* 5 (*Sup. Ct. Err.* 1949), is also distinguishable on the facts. An ordinance permitted uses including "schools," public libraries, public museums, clubs, philanthropic institutions and other uses. The question was whether a day school for children between the ages of 5 and 14, devoted to teaching of swimming, arts and crafts, boating, hiking, basketball, tetherball, volleyball, badminton, horseshoes, story telling, photography, croquet, fishing and free play, was within the term "schools." The Connecticut court answered this question in the affirmative. There was no question presented in the Langbein case analogous to those presently before this court.

And in *Concordia Collegiate Institute v. Miller*, 301 *N. Y.* 189, 93 *N. E. 2d* 632, 21 *A. L. R. 2d* 544 (*Ct. App.* 1950), the rationale of decision appears to have been that because "\* \* \* petitioner is in effect precluded from erecting any school building in the entire village as a matter of right, and, while boarding houses, multifamily houses, hospitals and hotels may be erected in residence districts, schools and churches may not \* \* \*" (93 *N. E. 2d*, at *page* 634), an amendment to the zoning ordinance (there under review) was unreasonable and the original zoning ordinance which had permitted the erection and use of schools, therefore stood in full force and effect. The entirely different factual situation presented to this court raises a question not necessary to the decision in the *Concordia* case, *supra*, and not determined therein.

In our own State, the only apparently germane decision is that of the former Supreme Court in *Lumpkin v. Township Committee of Bernards*, 134 *N. J. L.* 428 (*Sup. Ct.* 1946). In that case the facts were different from the facts in the present case. Lumpkin proposed to use a large stone mansion (resembling a European castle) situated upon 165 acres

of land (the building situate ½ mile from the main road) "at the side of a mountain, in a heavily wooded spot" in a sparsely settled area (on the same side of the road the nearest building was 1.2 miles distant from the plaintiff's building; on the opposite side of the road the nearest building was .6 miles distant), for a private boarding school for boys between the ages of 6 and 14 years. A special exception for this use was recommended by the board of adjustment to the governing body of the township, but was denied by the latter body without notice of hearing. The former Supreme Court held that "in the circumstances" the action of the governing body was arbitrary, unreasonable and capricious.

Students of zoning have expressed various ideas pertinent to the subject of our present inquiry. Schools and other institutions are stated to bring "certain elements of disadvantage to a home community" such as noise, excess of parked vehicles, continuous flow of visitors, delivery of food and other materials in large quantities, and removal of waste in large quantities. *Bassett, Zoning* (1940), *pp.* 70, 71. However Bassett (*p.* 196) expresses the view that it is unreasonable to force schools from less congested residence districts into more congested residence districts because "The children of such a district should properly go to school in that district * * *." Another expression is to the effect that although teaching in a home studio may be permissible as a profession in residence districts as an accessory use, if it is "extended to the point where it becomes a business and not an accessory use, it will, of course, not be permitted in a residence district." *Yokley, Zoning Law and Practice* (1948), *sec.* 191, *pp.* 379–380. But schools are "generally admitted in such areas." *Id., sec.* 195, *pp.* 383–384. Both Bassett and Yokley appear to treat the subject of schools from the community "public school" point of view and do not discuss the merits of points of differentiation as justification for municipal legislative treatment of schools in that category in separate classification from specialty schools and schools for "higher education." McQuillin, in his work on

*Municipal Corporations*, includes schools among "particular uses allowed or excluded from zoned districts * * *." 8 *McQuillin, Municipal Corporations* (*3rd ed.* 1950), *sec.* 25.177, *pp.* 309, 332–333. And another pertinent expression of opinion is:

"The residents of a city which is primarily a residential city by charter have a legal right, within constitutional limits, to keep the city a residential city. A general scheme for the maintenance and perpetuation of a high-class exclusively residential, district promotes the general welfare. Thus, the enactment of a zoning ordinance creating a district restricted to single residences has been held a valid exercise of the police power. * * *" 10 *Thompson on Real Property* (*Perm. ed.* 1940), *sec.* 5626, *pp.* 721–722.

References to the subject are also to be found in 58 *Am. Jur., Zoning, sec.* 134, *p.* 1013 and 62 *C. J. S., Municipal Corporations*, § 226, (8) *b .(b), p.* 455, without detailed discussion of the merits of the specific question involved on this appeal.

It is obvious from an examination of the opinion in *Euclid, Ohio, v. Ambler Realty Co., supra*, that the U. S. Supreme Court has not favored the view expressed by some authorities on zoning that zoning is designed to exclude from residence districts only those activities which are injurious, but has approved the view that zoning may validly exclude non-injurious uses where reasonable city planning prompts that course. Such a basis for zoning is not a novel theory. It has been said that the primary objects of zoning, often stated as the protection of public health and safety, include "the protection of the value and usefulness of urban land, and the assurance of such orderliness in municipal growth as will facilitate the execution of the city plan and the economical provision of public services," and that "Only by controlling to some degree the future population and character of use upon given areas and the proportion of impervious covering on given areas, can a city properly plan the size and location of streets and sewers. Zoning is the foundation upon which any permanent city planning must be built. But even from a purely public point of view the primary

object of zoning is to insure a maximum economic use of all land in the city. *Landels, Zoning: An Analysis of Its Purposes and Its Legal Sanctions*, 17 *A. B. A. Journal* (1931), 163, 165. These observations appear peculiarly appropriate to the purposes expressed in our statute. See *R. S.* 40:55-32, *supra*.

■ The conclusions irresistibly to be drawn from the pertinent authorities are: (a) "public schools" (*i. e.*, schools for the education of community children) and parochial schools (*i. e.*, private schools for religious instruction and the education of community children in accordance with the statutory requirements of compulsory education) are permissible uses in a strictly residential zone, as are houses of worship and "Sunday" schools (these uses being principally for the general and moral welfare of the surrounding community), and constitute a distinct class capable of recognition by a municipal zoning authority for exception from limitation to residential uses on the ground that the welfare of the residential community demands their inclusion in that area; (b) on the other hand, the exclusion of other schools (seminaries, colleges, universities, trade or professional schools, schools for the teaching of special arts, crafts or social activities) are reasonably placed in a separate classification; (c) this latter category may be reasonably excluded from a residential district, zoned for single homes, as constituting business uses or as opposed to the public interest in the particulars expressed in the statute (*L. 1928, c. 274, sec. 5, now R. S.* 40:55-32, *supra*), namely, "to lessen congestion in the streets; secure safety from fire, panic and other dangers; promote health, morals or the general welfare; provide adequate light and air; prevent the overcrowding of land or buildings; avoid undue concentration of population * * * with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality."

■■ (C) With respect to the application of these conclusions (namely, that schools for higher or special education may be constitutionally excluded from a residential district) to the present case, it is presumed in law that the zoning ordinance is reasonable in its application to the respondent's property, and it is settled that the burden is upon the one who attacks the particular ordinance in question to show clearly that it is unreasonable. *Cobble Close Farm v. Bd. of Adjustment, Middletown Twp.*, 10 *N. J.* 442, 451 (1952); *Monmouth Lumber Co. v. Ocean Township, supra* (9 *N. J.*, at *p.* 71); *State v. Mundet Cork Corp.*, 8 *N. J.* 359, 370–371 (1952), *certiorari* denied 344 *U. S.* 819, 73 *S. Ct.* 14, 97 *L. Ed.* —— (1952). In the present case the respondent did not overcome the presumption of reasonableness. Indeed, the record is devoid of evidence directed to the purpose of proving that the respondent's property is unsuited to any of the permitted uses in the zone in which it is situated. In this respect our views were recently detailed by Mr. Justice Brennan in the *Cobble Close Farm* case, *supra* (10 *N. J.*, at *pp.* 451–453). Viewed in the light of these conclusions the ordinance in question is not in contravention of the State and Federal Constitutions.

## III.

■ The last phase of the issues fairly presented by the questions involved in this case is whether section 2(a) of the ordinance, *supra*, excluding schools of the category of Eastern's institution, is invalidated by the unconstitutionality of clause (9) of that section. This is a question of legislative intent. Looking to the ordinance in question we find that clause (9) of section 2(a) confirmed the prohibition, contained in section 2(a), of the use in question, and that section 15 of the ordinance provided: "The invalidity of any section or provision of this ordinance shall not invalidate any other section or provision thereof." Under the circumstances of this case we are of the opinion that the provisions of

section 2(a) of the ordinance are separable, and that the invalidation of clause (9) thereof does not invalidate the remainder of the section nor the ordinance as a whole. There was in this case a distinct effort on the part of the municipal governing body exhibited in clause (9) of section 2(a) of the ordinance to emphasize their determination, evident from the antecedent language of section 2(a), that uses of the categories listed in clause (9) were opposed to the common good and general welfare of the residential area involved, in some or all of the particulars detailed in *L.* 1928, *c.* 274, *sec.* 5 (*R. S.* 40:55–32) under their comprehensive plan for the municipality and giving reasonable consideration to the character of the neighborhood as required by that statutory provision. To this extent the ordinance was effectively validated by the statute. The emphasis of the ordinance was to exclude the uses in any event, unless a special "spot" should be created by action of neighboring landowners and approval of the (zoning) board of appeals (this being the invalid delegation of legislative power hereinbefore adverted to). It follows that the intention must have been to exclude those uses even in the event that the "spot zoning" provision of clause (9) was declared invalid. The phraseology of section 15, *supra,* substantiates this conclusion for it relates not merely to sections of the ordinance determined invalid, but to any *section or provision* thereof. And the principles of separability of legislative enactments, based as they are upon the legislative intention, command the determination that under the circumstances of this case there was "such manifest independence of the parts as to clearly indicate a legislative intention that the constitutional insufficiency of the one part would not render the remainder inoperative." *Washington National Ins. Co. v. Board of Review,* 1 *N. J.* 545, 556–557 (1949); *State v. Doto,* 18 *N. J. Super.* 482, 492–493 (*App. Div.* 1952), affirmed on opinion below 10 *N. J.* 318 (1952); *Carter v. Carter Coal Co.,* 298 *U. S.* 238, 312–317, 56 *S. Ct.* 855, 80 *L. Ed.* 1160, 1189–1192 (1936). *Cf. Lynch v. United States,* 292 *U. S.* 571, 54 *S. Ct.* 840,

586, 78 *L. Ed.* 1434, 1444 (1934) ; *Champlin Refining Co. v. Corporation Commission,* 286 *U. S.* 210, 234–235, 52 *S. Ct.* 559, 76 *L. Ed.* 1062, 1078 (1932). Consideration of the factual elements and principles of law hereinabove discussed distinguishes the present case from *Washington ex rel. Seattle Title Trust Co. v. Roberge,* 278 *U. S.* 116, 121–122, 49 *S. Ct.* 50, 73 *L. Ed.* 210, 213–214 (1928). ·

### CONCLUSION

For the reasons expressed in this opinion that portion of the judgment of the Superior Court, Chancery Division, which dismissed the cross-claim of the intervening defendant City of Orange against the intervening defendant Eastern Christian Institute, for injunctive relief to effectuate enforcement of the municipal zoning ordinance is hereby reversed. The cause will be remanded to the Superior Court, Chancery Division, for the determination of the scope of the restraints to be imposed against Eastern Christian Institute conformably to this opinion and to the provisions of the zoning ordinance of the City of Orange, which do not demand for their effective enforcement the limitation of use of Eastern's property to a private dwelling for one family as sought by the City of Orange, as the ordinance permits other uses in addition thereto, and for entry of judgment consistent with such determination.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—None.