LA SALLE NATIONAL BANK *et al.,* Plaintiffs-Appellants and Cross-Appellees, *v.* THE THRESHOLDS, Defendant-Appellee and Cross-Appellant.

(No. 59674;

First District (3rd Division)—April 3, 1975.

636

Pedersen & Houpt, of Chicago (Paul S. Altman and Richard V. Houpt, of counsel), for appellant.

Sidley & Austin, of Chicago (Thomas H. Morsch and Harold F. See, of counsel), for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

The central issue involved in this appeal is whether the circuit court of Cook County erred in ruling that defendant's proposed use of its premises qualified as a permissible use under the applicable provisions of the 1973 Chicago Zoning Ordinance.

The subject property is located at 2700 Lake View Drive in the City of Chicago. The area is zoned general residence. As to the nature of the area, the dome-roofed Elks Memorial Building is located one-half block north of the subject property. A 40-story high-rise apartment building is being constructed across the street from the defendant's property. On Wrightwood Avenue west of Lake View Avenue stands a mansion owned by the Swedish Engineering Society, with another 40-story building nearby. Several high-rise buildings are located nearby at Sheridan Road and Diversey Avenue. Diversey Avenue contains various shops and restaurants. Included among the permissible uses for this area are the following:

"7.3-1   Permitted Uses—R1 Single-Family Residence District.
         *   *   *

   (11)  Schools, Elementary and High, non-boarding and including playgrounds and athletic fields incidental thereto.
         *   *   *

7.3-4   Permitted Uses—R4 General Residence District.
         *   *   *

   (4)   Foreign Consulates, Fraternal, Philanthropic and Eleemosynary Uses or Institutions   *   *   *."

On May 3, 1972, The Thesholds, defendant in this case, applied to the zoning administrator of the city of Chicago for an occupancy permit. The administrator denied the request. On May 19, 1972, the Chicago Zoning Board of Appeals reversed that determination and expressly found that the proposed use conformed to the city's zoning provisions. Subsequently, on March 29, 1973, La Salle National Bank, as trustee, and Howard C. Warren, as the trust beneficiary, filed suit seeking a declaratory judgment and injunction prohibiting the defendant from using the property in its proposed manner in purported violation of the Chicago Zoning Ordinance. Count II of the complaint charged that in

the event the proposed use was found to be a permissible one, the zoning ordinance should be declared unconstitutional as applied to plaintiffs. Defendant denied any violation of the zoning ordinance or of plaintiffs' constitutional rights, and additionally affirmatively asserted that the suit was barred by laches and by plaintiffs' failure to follow the provisions of the Administrative Review Act.

After a trial on the merits, the trial judge, as trier of fact, held that plaintiffs were not precluded from maintaining this suit; that defendant's proposed occupancy qualified as a nonboarding elementary or high school and "even more persuasive[ly]" as a philanthropic or eleemosynary institution, permissible uses for this property under the zoning ordinance; and that the ordinance is not unconstitutional as applied to plaintiffs. The trial court then dismissed the suit. Plaintiffs' appeal seeks to overturn the latter two sets of findings by the trial court. Defendant has filed a cross-appeal from the court's first set of findings.

The following pertinent evidence was adduced at trial. Jerry Dincin, executive director of defendant, called as a section 60 witness by the plaintiffs, testified to the basic organizational framework and procedures which would be used at its new facility. The organization's purpose is to provide assistance to persons suffering from emotional problems so as to enable them to establish themselves in their communities as productive and responsible citizens. To accomplish this purpose, defendant has set up various programs aimed at vocational and social rehabilitation, remedial education, and personal counselling.

The participants in the program would number about 140. Although almost all of them have been referred to defendant by professional agencies, clinics, private and State hospitals, and boards of education, participation is voluntary, and prospective members must undergo a screening process. The members would not board at the facility. About 90 percent of the current participants have been previously hospitalized for mental illness, and approximately 80 percent of the membership are currently on medication, chiefly tranquilizers and antidepressants. No medication is dispensed at the institute. The annual turnover is 100 percent.

Excluding the administrative personnel, defendant's staff consists of 22 full-time employees, including 8 supplied by VISTA, plus 40 volunteers. Several of the staff have advanced college degrees, and all of them take part in an intensive in-training program.

Dincin further testified that the vocational rehabilitative feature of the program is directed toward "personal adjustment training." The members are divided into four work groups, clerical, food services, house-

keeping, and building maintenance. The focus of these programs is to teach work habits and not skills. The staff also attempts to develop the members' ability to live independently.

Dincin also testified that the educational feature of its program is of equal importance to the other programs. Approximately 40 members currently take part. The schedule of classes changes every month or two and is geared to the members' needs. Among the subjects which were offered at the last session were mathematics and English at the 6th grade level, history, current events, and a civics course on a level of 11th or 12th grade. Eight to ten child members participate in a remedial education program pursuant to a contract with the Chicago Board of Education.

Dincin further testified on direct examination that defendant subsists through government grants and public and private solicitation. Defendant is registered in Illinois under the statute regulating solicitation of funds for charitable purposes and has been held exempt by this State from the retail occupational tax.

Loren Juhl, an attorney and chairman of defendant's building committee, testified that the purchase price for the building was $168,500. Architectural and attorneys' fees amounting to $40,000 and fund-raising expenses of $12,000 to $14,000 have also been incurred. Juhl testified that defendant is incorporated under the Illinois Not-For-Profit Corporation Act and that the Internal Revenue Service has determined that it is a tax-exempt organization and publicly supported charity.

James Foley, a real estate consultant and appraiser, testified that in his opinion the defendant's proposed use would have a deleterious effect on the general residential nature of the area. He considered defendant's activities to constitute a business use. The witness also felt that the fact that former mental patients would be on the premises would cause property values to depreciate.

In the opinion of Thomas Buckley, a city-planning and zoning consultant, defendant's occupancy on the subject premises would constitute two types of land uses—an office (for professional counselling) and a vocational-training facility. He believed the introduction of the proposed use in this area would have a detrimental effect upon this "high quality exclusive residential neighborhood." On cross-examination, the witness conceded that other structures and high-rises standing or being built in the immediate area are "certainly not homogeneous" from a planner's view with an exclusive family area use of the property.

Howard Warren, the coplaintiff, testified that although defendant performs a worthwhile service, its occupancy in the neighborhood would cause a depreciation in value of his nearby property and would generate

a fear for the safety of his family. Two other neighbors offered similar testimony. The prior occupant of the subject premises was the Harris school.

Jack Witkowsky, a real estate appraiser, testified on defendant's behalf. He perceived the area surrounding the subject property as having a heterogeneous cosmopolitan composition. In his opinion, defendant's proposed use would cause no measurable change in the monetary value of the property in that community. He believed that the nature of the community and the type of buildings found therein would continue to attract good residents. On cross-examination, Witkowsky acknowledged that his philosophy that residential and commercial uses can coexist on the same block is not consistent with most zoning ordinances as presently drawn.

■■ In considering plaintiffs' initial contention that the trial court erred in finding defendant's proposed use to be permissible under the ordinance, we are guided by several basic rules. We must construe this ordinance in the same fashion as a statute and thus give effect to the intentions of the drafters. (*Niles Improvement Ass'n v. J. Emil Anderson & Son* (1968), 93 Ill.App.2d 167, 236 N.E.2d 402.) We will not construe a portion of the ordinance in isolation; we must give force to all the provisions of the ordinance germane to the subject matter involved. (*Oak Park Trust & Savings Bank v. Village of Elmwood Park* (1969), 113 Ill.App.2d 121, 251 N.E.2d 788.) To achieve this purpose, a court should focus upon the terminology used, the objects sought to be attained, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance as a whole. (2 Yokley, Zoning Law and Practice § 19—6, at 429 (3rd ed. 1965).) As with most zoning questions, the trial court's ruling will not be disturbed unless contrary to the manifest weight of the evidence. *Walz v. Traders Development Corp.* (1967), 80 Ill.App.2d 386, 224 N.E.2d 483.

■■ Under the foregoing criteria, we believe that the trial court erred in finding that the proposed land use qualified as an elementary or high school within the purview of the Chicago Zoning Ordinance. Several factors underlie our determination that the words "schools, elementary and high" should be construed in their generally understood sense as academic institutions for learning and not in some all-embracive sense. (See *Yanow v. Seven Oaks Park, Inc.* (1953), 11 N.J. 341, 94 A.2d 482; *Wadsworth v. Board of Adjustment* (1951), 11 N.J. Super. 502, 78 A.2d 619.) The ordinance itself emphasizes the residential character of the area. Agricultural uses are permitted to exist in this district "provided that no offensive odors or dust are created" (article 7.3-1(2)), and golf

courses are allowed as long as they are not "commercially-operated driving ranges or miniature golf courses" (article 7.3—1(6)). Another element influencing our belief is that the school use found in subsection 11 is modified by the additional incidental use of "playgrounds and athletic fields." We finally find it significant that the drafters of the ordinance have distinguished the many types of "schools" by expressly designating music, dance, business, commercial, and trade schools to be permissible uses in districts other than residential. See articles 8.3—2 (B), 8.3—4(B), 8.3—6(B), 10.3—1.

■■ A review of the evidence established in the present case finds no similarity to the core educational curriculum offered at a typical, purely academic grade or high school. (Compare *Voisard v. County of Lake* (1960), 27 Ill.App.2d 365, 169 N.E.2d 805.) The groups at defendant's facility are not organized to learn a skill but to learn a work habit. The education courses that are offered vary from month to month. Although defendant is engaged in a remedial education program with the Chicago Board of Education, only a few members participate. The absence of an organized set of core educational courses comparable to those offered at purely academic elementary or high schools involving the participation of all or most of the members is fatal to the view that the proposed use qualifies under the ordinance as a school. .

The trial court, however, made an alternative ruling that defendant's proposed use fits within the scope of article 7.3-4(4) of the ordinance. That provision includes among its listed permissible uses "Philanthropic and Eleemosynary Uses or Institutions." It also prescribes a footage limitation for office space which is not at issue in the present case.

■■ A quick and isolated reading of the subsection might suggest that a facility would be permitted to occupy the subject premises if *either* its purpose *or* its method of support is charitable. However, such a reading would permit any commercial enterprise to occupy the premises as long as it is charitably funded. Viewing the ordinance as a whole, we cannot perceive this to have been the drafters' intent. (See *Westchester County Society v. Mengel* (1943), 41 N.Y.S.2d 605, 266 App. Div. 151.) We construe the clause as making optional the method of financing for the proposed occupant while making obligatory that occupant's enterprise be devoted to an "eleemosynary" or "philanthropic" purpose.

■■ The above words are neither defined in the ordinance nor in the opinion of courts in this jurisdiction in comparable factual settings. Plaintiffs propose that the words are so vague or general in meaning as to require our application of the *ejusdem generis* rule. This would result in having these words embrace only objects similar in nature to those

enumerated by the antecedent specific words, here "Foreign Consulates" and "Fraternal  *  *  *  Uses or Institutions."

We do not accept this approach. Our concern with the words in this case is not so much with vagueness of definition as with difficulty of application. As far back as *People ex rel. Ellert v. Cogswell* (1896), 113 Cal. 129, 45 P. 270, the California Supreme Court, faced with the issue of defining the phrase "eleemosynary trust," stated at pages 137-138:

> "It is quite true that the word 'eleemosynary' comes to us from the Greek word meaning alms, but, while it is always interesting to note the origin and first meanings of words, this knowledge is frequently more curious than valuable; while to insist that the original meaning shall govern the word in its modern use and acceptation is very rarely permissible.  *  *  *  Eleemosynary has come in the law to be interchangeable with the word 'charitable.'  *  *  *  It is impossible to enumerate specifically all purposes for which an eleemosynary trust may be created. The difficulty is inherent in the subject matter itself. With the progress of civilization new needs are developed, new vices spring up, new forms of human activity manifest themselves, any or all of which  *  *  *  may become the proper object of an eleemosynary trust."

■■■ We have also concluded that the word "eleemosynary" has come to be synonymous with the word "charity." As such it is capable of broad application. In the case of *People v. Young Men's Christian Ass'n* (1936), 365 Ill. 118, 6 N.E.2d 166, the court had to determine whether defendant was a charitable organization for tax purposes. In holding that it was, the court noted, at page 122, that charity "in a legal sense" is

> " '*  *  *  for the benefit of an indefinite number of persons, either by bringing their minds and hearts under the influence of education or religion,  *  *  *  by assisting them to establish themselves in life  *  *  *  or by otherwise lessening the burdens of government.'  *  *  *  'Charity,' in law, is not confined to the relief of poverty or distress or to mere almsgiving but embraces the improvement and promotion of the happiness of man."

Moreover, even if "eleemosynary" were to retain its original meaning, the word "philanthropic" would have significance in this case. According to Webster's Dictionary, it refers to an "effort to promote human welfare."

■■■ We must also allay other concerns expressed by plaintiffs. We are cognizant of the rule that wherever possible in furtherance of legislative intent the specific takes precedence over the general. Thus those

enumerated permissible uses for this district set out in article 7.3-1 which are commonly accepted as "eleemosynary" or "philanthropic," such as schools, public libraries, and churches, are not regulated by the office footage limitation set forth in article 7.3-4(4). Similarly, those enumerated special uses for this district set forth in article 7.4-4 which can certainly be perceived as being charitably directed, such as institutions for the care of the insane or feebleminded, sheltered care homes, rest homes, and halfway houses, cannot hope to be transformed into a permissible use on the ground that they are rooted in eleemosynary or philanthropic activities approved in article 7.3-4(4). Since we find that the proposed use in this case does not fit within the permissible uses of article 7.3-1 or the special uses of article 7.4-4, we come to the question of whether it is embraced by article 7.3-4(4).

Plaintiffs have not challenged the authenticity of defendant's claim to be charitably funded, supported, and recognized. A review of the record finds defendant's position to be well founded. In determining the validity of defendant's claim that its activities are directed to eleemosynary or philanthropic concerns, we look to the evidence adduced.

Defendant's avowed aim is to assist persons recovering from mental or emotional illness to re-establish themselves in the community. The participants voluntarily apply and undergo a fairly detailed screening process. An aim of the interview is to decide whether the applicant really hopes to overcome his difficulties and whether defendant's programs can benefit the applicant. The programs are aimed at developing the participant's vocational and social rehabilitation, at fostering his social awareness, and at exposing him to educational opportunities. On-the-spot counselling is an important factor in attempting to show the members how to overcome particular deficiencies.

■■ The world we live in is becoming increasingly complex and impersonal. Those unable to cope with it experience frustrations which, without help, may never be overcome. They cannot be characterized as feebleminded, insane, or mentally retarded. Recognizing their inadequacy and encouraged by various agencies, they apply to defendant to gain an opportunity to change their lives and develop into useful members of society. Defendant's programs must be viewed from the record as being worthwhile in the mental health field. It cannot be seriously questioned that its programs are devoted toward promoting the well-being of social man, improving his physical and mental outlook, and fulfilling important needs of the individual and society as a whole. (See *Camp Isabella Freedman of Connecticut, Inc. v. Town of Canaan* (1960), 147 Conn. 510, 162 A.2d 700; *Vanguard School Tax Exemption Case* (1968), 430 Pa. 378, 243 A.2d 323.) We conclude that the trial court's decision that defendant's

proposed use constituted a permissible use under article 7.3—4(4) of the city ordinance as an "eleemosynary" or "philanthropic" use or institution was not against the manifest weight of the evidence.

Plaintiffs' final contention is that the trial court erred in refusing to declare this ordinance as construed unconstitutional as applied to them. ■■■ We need not reach this issue because no governmental body has been joined as a party. We believe that a governmental body or proper governmental officer is an indispensable party to a proceeding challenging the constitutionality of its ordinance. (See 26 C.J.S. *Declaratory Judgments* § 132, at 304-305 (1956); *Cobble Close Farm v. Board of Adjustment* (1952), 10 N.J. 442, 92 A.2d 4; *Mayer v. Board of Adjustment* (1959), 56 N.J. Super. 296, 152 A.2d 860, *rev'd on other grounds* (1960), 32 N.J. 130, 160 A.2d 30; *Central Realty Corp. v. Allison* (1951), 218 S.C. 435, 63 S.E.2d 153.) Consequently, the absence of the municipality prevented the trial court from securing jurisdiction to rule on the ordinance's validity. (See *Board of Trustees v. Talley* (1971), 286 Ala. 661, 244 S.2d 791.) Plaintiffs' argument is, in effect, an impermissible collateral attack on the validity of the ordinance, which defendant need not defend. (*People ex rel. Joseph Lumber Co. v. City of Chicago* (1949), 402 Ill. 321, 83 N.E.2d 592; *Reeder v. Iowa State Highway Com.* (Iowa 1969), 166 N.W.2d 839.) It cannot be entertained.

Our resolution of these issues renders unnecessary an examination of defendant's cross-appeal.

Accordingly, the judgment of the circuit court of Cook County dismissing plaintiffs' complaint is affirmed.

Judgment affirmed.

DEMPSEY and MEJDA, JJ., concur.