628 A.2d 270

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BENNIE
EUGENE BRIDGES, DEFENDANT–RESPONDENT.

Argued January 4, 1993—Decided July 30, 1993.

*Robert E. Bonpietro,* Deputy Attorney General, argued the cause for appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for respondent (*Zulima V. Farber,* Public Defender, attorney).

The opinion of the Court was delivered by

HANDLER, J.

Defendant in this case was convicted by a jury of conspiracy and several substantive crimes, including murder, which were committed in the course of carrying out the conspiracy. On appeal the Appellate Division, with a dissent, ruled that the liability of a co-conspirator for the commission of substantive crimes, like accomplice liability, requires specific intent to commit those crimes. On that ground it affirmed the conspiracy conviction but reversed the substantive criminal convictions. The dissent concluded that a conspirator can be vicariously liable for the substantive crimes of co-conspirators without the specific mental state otherwise required of those crimes, provided that their commission of those crimes was foreseeable as a natural consequence of the conspiracy.

The issue that divided the Appellate Division poses the question on this appeal brought by the State as of right. *R.* 2:2–1(a).

## I

On September 2, 1988, defendant, Bennie Eugene Bridges, attended a birthday party with some fifty to sixty young people for sixteen-year-old Cheryl Smith in the basement of her home in Roebling, New Jersey. At about 12 a.m., Bridges had an argument with another guest, Andy Strickland. Shortly after the heated exchange, Bridges left the party, yelling angrily into the basement that he would soon return with his "boys." As he drove past the house on his way to Trenton, Bridges again shouted, "I'm going back to Trenton to get my niggers."

When Bridges arrived in Trenton he met two acquaintances, co-defendants Keith D. Bing and Eddie E. Rolle. Bridges asked Bing and Rolle to return to the party with him because he expected a confrontation. The two co-defendants agreed to ac-

company Bridges to the party in Roebling. On the way to the party, the trio briefly stopped at Bing's house in West Trenton. Bridges remained in the car while the co-defendants entered the house. On returning to the car, co-defendants told Bridges that they had "some stuff for the guys" at the party. Bridges understood that to mean that Bing and Rolle had retrieved either guns or knives from Bing's house. After driving a few blocks, co-defendants told Bridges that they were carrying guns "so they'll stay back." According to Bridges, the guns were necessary "to intimidate the majority of the boys at the party."

Bridges and his companions returned to the party at approximately 2 a.m. A witness who was a guest at the party testified that he heard Rolle say, "Trenton's in the house. Now there's going to be trouble." Bridges exclaimed, "I'm not no joke."

The trio entered the basement, and Bridges began to argue again with Strickland. Defendant said he would not leave the house until he "fuck(ed) somebody up." John Raspberry, a friend of Strickland, interceded and agreed to fight. A crowd then gathered to watch Bridges and Raspberry begin their fight in the street in front of Smith's house. Bing shouted to the crowd, "Nobody jump in," and Rolle warned, "Nobody here is Superman." A witness testified that the statement by Rolle was meant to imply that nobody in the crowd was bullet-proof.

During the fight Bridges was able to get on top of Raspberry, at which point either Strickland or another member of the crowd pulled defendant off and struck him in the head. At the same time, a member of the crowd struck Bing in the face. Bing immediately drew a .22 caliber revolver, and Rolle pulled out a .32 caliber revolver. Rolle pointed the gun at the crowd and then fired it into the air. Numerous shots were then fired into the crowd as the onlookers tried to flee. Shawn Lockley was shot in the chest and died at the scene; Paul Suszynski was injured by a bullet in the shoulder.

The trio quickly returned to their car, and Bridges asked the co-defendants for their guns, which he later hid in his grandparents'

home. The next day, an investigator from the Burlington County Prosecutor's Office tried to locate Bridges by interviewing defendant's mother, sister, cousin, and girlfriend. That same afternoon defendant's mother informed him that the police were looking for him and that someone had died as the result of the shooting the night before. Bridges then rapidly retrieved the guns and placed them in another hiding place.

That evening the trio went to Manhattan to obtain false identification, and the next morning they caught a flight to Atlanta. Bing and Rolle flew on to Jacksonville, Florida. Bridges stayed in Atlanta for one month and then moved on to Fayetteville, North Carolina. While Bridges was in Fayetteville, Bing told him by phone that he and Rolle had been arrested. Bridges himself was soon arrested by a North Carolina Highway Patrol officer after he was pulled over for speeding.

The two guns used in the shooting were eventually turned over to the police through an informant. The serial number of the .32 caliber revolver had been removed. Neither co-defendant had a permit for the guns.

The State charged Bridges with conspiracy to commit the crimes of possession of a weapon for an unlawful purpose (contrary to *N.J.S.A.* 2C:39–4a); conspiracy to possess a weapon without a permit (contrary to *N.J.S.A.* 2C:39–5b); and conspiracy to commit aggravated assault (contrary to *N.J.S.A.* 2C:12–1b(4)), as well as those substantive crimes. Under *N.J.S.A.* 2C:12–1(b)(4), aggravated assault consists of "knowingly under circumstances manifesting extreme indifference to the value of human life points a firearm . . . at or in the direction of another . . ." In addition, the State charged defendant under *N.J.S.A.* 2C:11–3a(1) with murder, the lesser crime of aggravated manslaughter, and possession of a defaced firearm "by being legally accountable for the conduct of a co-conspirator whose acts are the natural and probable consequences of the conspiracy."

After a five-day jury trial, Bridges was convicted of second-degree conspiracy for the three counts charged (contrary to

*N.J.S.A.* 2C:5–2); murder (contrary to *N.J.S.A.* 2C:11–3a(1)); third-degree aggravated assault (contrary to *N.J.S.A.* 2C:12–1b(2)); fourth-degree aggravated assault (contrary to *N.J.S.A.* 2C:12–1b(4)); two counts of possession of a firearm for an unlawful purpose (contrary to *N.J.S.A.* 2C:39–4a); and two counts of possession of a handgun without a permit (contrary to *N.J.S.A.* 2C:39–5b). Bridges was acquitted on one count of possession of a defaced firearm (pursuant to *N.J.S.A.* 2C:39–3d).

The trial court merged the murder conviction with the second-degree conspiracy, fourth-degree aggravated assault, and the two convictions for the possession of a firearm for an unlawful purpose, and sentenced Bridges to a term of life imprisonment with a thirty-year period of parole ineligibility. It imposed a consecutive term of four years with a three-year period of parole ineligibility for the third degree-aggravated assault, and to a concurrent term of four years on the two merged convictions for carrying a firearm without a permit. The Appellate Division, with a dissent, affirmed the second-degree conspiracy conviction but reversed Bridges' other convictions and remanded the matter for retrial. 254 *N.J.Super.* 541, 568, 604 *A.2d* 131 (1992).

The Appellate Division majority determined that the Code of Criminal Justice, which provides that the involvement in a conspiracy can be the basis for criminal liability for the commission of substantive crimes, *N.J.S.A.* 2C:2–6b(4), requires a level of culpability and state of mind that is identical to that required of accomplice liability. The Appellate Division therefore ruled that a conspirator is vicariously liable for the substantive crimes committed by co-conspirators only when the conspirator had the same intent and purpose as the co-conspirator who committed the crimes. 254 *N.J.Super.* at 560, 562, 604 *A.2d* 131.

## II

The provision of the New Jersey Code of Criminal Justice ("Code") that posits criminal liability on the basis of participation

in a conspiracy is silent with respect to its culpability requirement. It provides:

A person is legally accountable for the conduct of another person when: ... He is engaged in a conspiracy with such other person.

[*N.J.S.A.* 2C:2–6b(4).]

The majority below concluded that the Code contemplated "complete congruity" between accomplice and vicarious conspirator liability. 254 *N.J.Super.* at 562, 604 *A.*2d 131. The majority acknowledged that *State v. Stein,* 70 *N.J.* 369, 360 *A.*2d 347 (1976), may be a controlling decision. However, it believed that its interpretation of the Code, that a co-conspirator share with the perpetrator the intent to commit the substantive crime, was not inconsistent with that decision. *Id.* 254 *N.J.Super.* at 553–55, 604 *A.*2d 131. By contrast, the dissent found that the statute was designed to codify the Court's holding in *Stein,* and that holding, contrary to the majority's interpretation, recognized liability of a co-conspirator for crimes that were the natural and probable consequence and were committed in furtherance of the conspiracy without having any specific intent to commit those crimes. *Id.* at 569, 604 *A.*2d 131 (Shebell, J.A.D., dissenting).

### A.

Because the holding in *Stein* is central to an understanding of conspiracy liability, and was the principal point of contention in the Appellate Division, our examination of *N.J.S.A.* 2C:2–6b(4) begins with an analysis of that decision.

The defendant in *Stein* was a Trenton attorney who suggested to an "underworld figure" that a particular home would be a good target for a burglary because the residents kept large amounts of cash on hand. 70 *N.J.* at 373, 360 *A.*2d 347. About a year after the defendant's last conspiratorial discussion with the "underworld figure," an armed robbery occurred at the residence. *Id.* at 374, 360 *A.*2d 347. The defendant was not at the scene and did not participate. The police arrived while the robbery was in progress,

and the culprits took the homeowner's wife and daughter hostage in an attempt to escape. *Ibid.* During the ensuing high speed chase, the robbers crashed into a road block and critically injured two police officers. The mother and daughter, however, were freed. *Id.* at 374–75, 360 *A.*2d 347.

At trial, the defendant was convicted of conspiracy to steal currency, armed robbery, assault with an offensive weapon, kidnapping, kidnapping with an offensive weapon, assault on the injured police officers, obstruction of justice, and conspiracy to obstruct justice. *Id.* at 374, 360 *A.*2d 347. The Appellate Division reversed all but the two conspiracy convictions and the conviction for armed robbery. *Ibid.* This Court on appeal noted that the trial court had used the "conventionally stated rule" that conspirators are liable for the criminal acts of their co-conspirators that "follow[ ] incidentally in the execution of the common design as one of its probable and natural consequences ..." *Id.* at 387, 360 *A.*2d 347. It applied that rule to hold that the robbery and the assault on the homeowner's wife were natural or probable consequences of the conspiracy, and that the defendant's convictions on those counts should be upheld. *Id.* at 389, 360 *A.*2d 347. However, the Court ruled that the defendant's convictions for kidnapping and armed assault on the police should be reversed because "it would be unreasonable for a fact-finder to find ... beyond a reasonable doubt that they were necessary, natural or probable consequences of the conspiracy." *Id.* at 390, 360 *A.*2d 347.

The Court in *Stein* confirmed the basic principles of the substantive law concerning co-conspirator liability in this State. That law, most broadly stated, held a conspirator responsible for all criminal acts committed in furtherance of the conspiracy. *E.g.,* *State v. Murphy,* 168 *N.J.Super.* 214, 217–18, 402 *A.*2d 944 (App. Div.1979); *State v. Maddox,* 153 *N.J.Super.* 201, 212, 379 *A.*2d 460 (App.Div.1977).

The most influential common-law precursor to *Stein* was *State v. Carbone,* 10 *N.J.* 329, 91 *A.*2d 571 (1952), a gambling-conspiracy case, in which the Court ruled that the acts of one conspirator in

furtherance of the conspiracy are deemed to be the acts of all of the co-conspirators under a mutual-agency theory. *Id.* at 339–40, 91 *A.*2d 571. The Court most recently affirmed the agency principles of *Carbone* in *State v. Phelps,* 96 *N.J.* 500, 510, 476 *A.*2d 1199 (1984) (explaining that a conspiracy "confers upon co-conspirators the authority to act in another's behalf to achieve the goals of the common scheme" and that "conspirators are substantively liable for the acts of their co-conspirators in furtherance of the common plan" (citing *Carbone, supra,* 10 *N.J.* at 339–40, 91 *A.*2d 571)); *see also State v. Porro,* 152 *N.J.Super.* 179, 188, 377 *A.*2d 909 (App.Div.1977) (citing *Carbone* for rule that acts and declarations of conspirator in furtherance of conspiracy are binding on all parties to conspiracy).

The Court in *Stein* was strongly influenced by the United States Supreme Court's decision in *Pinkerton v. United States,* 328 *U.S.* 640, 66 *S.Ct.* 1180, 90 *L.Ed.* 1489 (1946). The Supreme Court in *Pinkerton,* dealing with the liability of co-conspirators, extended the settled law concerning liability for an overt act to all substantive acts "committed by one of the conspirators in furtherance of the unlawful project," that is, "acts done in execution of the enterprise." *Id.* at 647, 66 *S.Ct.* at 1184, 90 *L.Ed.* at 1496. Significantly, the Supreme Court added:

> A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project or *was merely a part of the ramification of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.* But as we read this record, that is not the case. (Emphasis added).

> [*Ibid.* ]

The general rule of co-conspirator liability that *Stein* extrapolates from *Pinkerton* is that so long as a conspiracy is still in existence, " 'an overt act of one partner may be the act of all without any new agreement specifically directed to that act,' " provided the substantive act could " 'be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.' "

70 *N.J.* at 388, 360 *A.2d* 347 (quoting *Pinkerton, supra,* 328 *U.S.* at 647–48, 66 *S.Ct.* at 1184, 90 *L.Ed.* at 1497).

The Appellate Division majority reasoned that *Pinkerton* was not designed to "read out of vicarious liability the element of intent vis-a-vis the substantive offense." 254 *N.J.Super.* at 554, 604 *A.2d* 131. It said that *Pinkerton*'s language—"which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement"—plainly mandates that a crime "must have been within [a co-conspirator's] contemplation when he entered into the agreement and reasonably comprehended by his purpose and intention in entering into the agreement." 254 *N.J.Super.* at 554–55, 604 *A.2d* 131.

■ The Appellate Division thus interpreted *Pinkerton* to prescribe a requirement of subjective foreseeability of the criminal consequences as a basis for vicarious co-conspirator liability. That understanding of *Pinkerton* is not supported. Although the determination, uttered as *dictum,* in *Pinkerton* has been subject to criticism, *see, e.g.,* Note, *Vicarious Liability for Criminal Offenses of Co–Conspirators,* 56 *Yale L.J.* 371 (1947), it has not been disputed that it purported to impose vicarious liability on each conspirator for the acts of others based on an objective standard of reasonable foreseeability. Even though what weight courts would ultimately give to that rule was unclear, Note, *Developments in the Law—Criminal Conspiracy,* 72 *Harv.L.Rev.* 920, 994 (1959), it was understood that the liability of a co-conspirator under the objective standard of reasonable foreseeability would be broader than that of an accomplice, where the defendant must actually foresee and intend the result of his or her acts. *Id.* at 996.

That understanding of *Pinkerton* is also widely accepted by commentators and treatises, whether they are critical of its rule, *see, e.g.,* Sanford H. Kadish, *Complicity, Cause and Blame: A Study In the Interpretation of Doctrine,* 73 *Cal.L.Rev.* 323, 363–64 (1985); Paul H. Robinson, *Imputed Criminal Liability,* 93 *Yale L.J.* 609, 666 n. 226 (1984) (citing, among other cases, *Stein,*

*supra* ); Note, *Survey of Criminal Procedure—Double Jeopardy, Right to Counsel, Entrapment, Prosecution Disclosure of Material Evidence (1975–76 N.J. Supreme Court Term),* 30 *Rutgers L.Rev.* 630, 643 (1977), or only expounding the existing law. *See, e.g.,* 15A *C.J.S. Conspiracy* § 74 (Supp.1992); 16 *Am.Jur.2d Conspiracy* § 19 (Supp.1992); Note, *Conspiracy,* 24 *Am.Crim.L.Rev.* 459, 485 (1987); 4 *Wharton's Criminal Law* § 732 (Torcia, 14th ed. 1981). That understanding of *Pinkerton* is also consistently followed by federal courts. *See, e.g., United States v. Garcia,* 954 *F.*2d 12, 15 (1st Cir.1992); *United States v. Russell,* 963 *F.*2d 1320, 1322 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 *S.Ct.* 280, 121 *L.Ed.*2d 207 (1992); *United States v. Montanye,* 962 *F.*2d 1332, 1345 (8th Cir.1992); *United States v. Jordan,* 927 *F.*2d 53, 56 (2d Cir.1991), *cert. denied,* —— U.S. ——, 111 *S.Ct.* 2811, 115 *L.Ed.*2d 983 (1991); *United States v. Anderson,* 933 *F.*2d 1261, 1275 (5th Cir.1991); *United States v. Edwards,* 945 *F.*2d 1387, 1392 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 *S.Ct.* 1590, 118 *L.Ed.*2d 308 (1992); *United States v. Gonzalez,* 918 *F.*2d 1129, 1134 (3d Cir.1990); *United States v. Garcia,* 909 *F.*2d 1346, 1350 (9th Cir.1990); *United States v. Lawson,* 872 *F.*2d 179, 182 (6th Cir.1989), *cert. denied,* 493 *U.S.* 834, 110 *S.Ct.* 110, 107 *L.Ed.*2d 72 (1989); and *United States v. Broadwell,* 870 *F.*2d 594, 603–04 (11th Cir.1989), *cert. denied,* 493 *U.S.* 840, 110 *S.Ct.* 125, 107 *L.Ed.*2d 85, (1989). Hence, the assertion of the lower court majority that the holding in *Stein,* as derived from *Pinkerton,* is a "shorthand expression ... of the principle ... that the substantive crime must have been a necessary or natural consequence of the agreement which was reasonably foreseen as such by the conspirator," 254 *N.J.Super.* at 555, 604 *A.*2d 131, does not comport with the widely accepted understanding of the *Pinkerton* rule.

## B.

The Appellate Division majority further determined that the Legislature, although cognizant of the *Stein* decision, did not intend to eliminate or reduce the mental state requirement of a

conspirator for a co-conspirator's commission of a substantive crime in enacting *N.J.S.A.* 2C:2–6b(4).

According to the majority, the Final Report of the New Jersey Criminal Law Revision Commission, which proposed the Code in 1971, rejected the separate imposition of the vicarious liability for co-conspirators. The legislative history of *N.J.S.A.* 2C:2–6b(4), which was subsequently added and makes express reference to vicarious conspirator liability, was too sparse to suggest that the *Stein* decision had prompted the Legislature to make a change in the Code. However, the legislative history available to the Appellate Division has been supplemented by documentation subsequently discovered in the archives of the Office of Legislative Services. That history directly illuminates the passage of the Code's vicarious-liability conspiracy provisions.

The original draft of *N.J.S.A.* 2C:2–6, completed in 1971, did not contain subsection b(4). The first version provided for "legal accountability" for the commission of crimes by others without any reference to conspiracy as a basis therefor. It thus mirrored § 2.06 of the Model Penal Code (MPC), see I *Model Penal Code and Commentaries* at 295–97 (1985), and the commentary to the proposed draft closely followed the rationale used to explain the structure of MPC § 2.06. See I *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* at 18–19 (1971) (Final Report).

Borrowing from the MPC commentary, the Commission commentary explained that conspiracy by itself, contrary to existing case law in New Jersey, should be eliminated as a basis of vicarious liability for substantive crimes committed in furtherance of the conspiracy because "there [was] no other or better way to confine within reasonable limits the scope of liability to which conspiracy may theoretically give rise" and to end the practice of imposing co-conspirator liability for all substantive offenses in "sprawling conspiracies." II *Final Report, supra* at 58. Consequently, the original draft of the Code confined vicarious criminal

liability to accomplices who had the purpose of promoting or facilitating the commission of a specific substantive offense. *Ibid.*

Nonetheless, by the time the Legislature passed the Code in 1978, subsection 6b(4) was included. The majority of the Appellate Division found that "the insertion of [the] subsection was for technical reasons only ... [perhaps] as a matter of symmetry," 254 *N.J.Super.* at 561, 604 *A.*2d 131. However, the legislative history subsequently discovered dispels that inference.

Some three years after the Commission had issued its *Final Report* on the proposed Code, the Assembly Judiciary, Law, Public Safety and Defense Committee (Judiciary Committee), held a meeting on November 14, 1974, regarding the proposed draft of the Code. A memorandum of the minutes for that meeting reveals that a representative from the Attorney General's Office objected to excluding from subsection 2C:2–6(b) any provision making a conspirator responsible for the actions of co-conspirators in furtherance of a conspiracy. The representative stated that that provision was particularly important in organized-crime prosecutions. To meet that concern, it was suggested that the language "he is engaged in conspiracy with such other person" be added to subsection b. The Committee acceded to that request, and accepted the amendment to the section without further discussion.

Comments on the draft of the Code (Comments), prepared by the Department of Public Safety of the Division of Criminal Justice and distributed to the members of the Assembly and Senate Judiciary Committees on July 10, 1974, provide the background to the Judiciary Committee's decision to amend subsection b. Those comments criticized *N.J.S.A.* 2C:2–6 because, as formulated, it did not make conspiracy alone a basis for vicarious liability. According to the commentary, the provision constituted "an unwise departure from existing law" and "loom[ed] as an obstacle to organized crime prosecutions." (Comments at 38, 41). The comments pointed out that the *Pinkerton* decision (which this Court relied on in *Stein* two years thereafter), and *Carbone,*

*supra*, 10 *N.J.* 329, 91 *A.*2d 571, were controlling and rendered a defendant liable for the acts of co-conspirators in furtherance of a conspiracy. *Id.* at 38–39. Most important, the comments contested the Commission's claim that excluding co-conspirator liability altogether was the only way to limit the scope of liability to fair proportions. *Id.* at 40–41. The comments noted that *Pinkerton* provided ample protection because it made co-conspirators liable only for those crimes that were "reasonably foreseen as a necessary or natural consequence" of the particular conspiracy. *Id.* at 40 (citing *Pinkerton, supra*, 328 *U.S.* at 647–48, 66 *S.Ct.* at 1184, 90 *L.Ed.* at 1497).

In addition, on January 12, 1977, the Legislative Services Agency of the Law Revision and Legislative Services Commission circulated a memorandum to members of the Senate that stated, "much of Chapter 2 [of the proposed Code] is a restatement of present law." The memorandum did not include subsection 6b(4) among the subsections that constituted "major changes" to existing case law. Its absence is consistent with the description of the common law provided to the Assembly and Senate Judiciary Committees on July 10, 1974. Moreover, this Court rendered its decision in *Stein* prior to the January 12, 1977, memorandum of the Legislative Services Survey. If any doubt existed about the state of the law regarding co-conspirator liability before 1976, the Court clearly resolved that issue in *Stein.* Consequently, when on January 12, 1977, the Legislative Services Agency did not include subsection 6b(4) as a major change to the existing common law, the exclusion clearly implied that it understood 6b(4) to be consistent with the holding of *Stein.*

The majority of the Appellate Division infers from a December 17, 1974, memorandum from the Legislative Services Agency that subsection 6b(4) was added to the Code for mere "technical reasons only." 254 *N.J.Super.* at 561, 604 *A.*2d 131. That memorandum had failed to note in the table of contents to Chapter 2 that 2C:2–6 had been changed from the Commission's 1971 text. However, in light of evidence that clearly indicates that subsection 6b(4) was added in response to the specific and expressed concern

that the drafters had excluded vicarious responsibility for co-conspirators, we can fairly infer that the absence of a notation next to *N.J.S.A.* 2C:2–6 was inadvertent.

That commentators do not ascribe a purposeful or knowing intent requirement to *N.J.S.A.* 2C:2–6b(4) is noteworthy. Robert E. Knowlton, the chairman of the Commission that drafted the Code, observed that co-conspirator liability under the revised Code went beyond the Model Penal Code provision. Robert E. Knowlton, *Comments Upon the New Jersey Penal Code*, 32 *Rutgers L.Rev.* 1, 6 (1979). Knowlton criticized the "broad provision" as unnecessary because the accomplice-liability provisions of *N.J.S.A.* 2C:2–6b would be sufficient to punish leaders of organized-crime gangs. *Id.* at 7. John M. Cannel, who was present as a representative of the Public Defender's Office on November 14, 1974, when the Assembly Judiciary Committee added subsection 6b(4) to the draft of the Code, believed that when read in isolation, *N.J.S.A.* 2C:2–6b(4) could be construed to impose a broad scope of liability. Cannel assumed, however, citing the *Stein* decision, that liability should be limited as "it was ... before the Code to those acts which are the ordinary consequences of the conspirational project." John M. Cannel, *New Jersey Criminal Code Annotated*, comment 6 *N.J.S.A.* 2C:2–6 (1992).

Finally, we note that the Legislature passed the Code in 1978, *L.* 1978, *c.* 95, two years after the Court had rendered the *Stein* opinion. The decisional law at the time of the enactment is germane to the meaning to be ascribed to a statute. *E.g., Yanow v. Seven Oaks Park, Inc.*, 11 *N.J.* 341, 350, 94 *A.*2d 482 (1953). In the absence of a clear manifestation to the contrary, a court may not impute to the Legislature an intention to change established law. *State v. Dalglish*, 86 *N.J.* 503, 512, 432 *A.*2d 74 (1981). In fact, the Legislature itself provided that the substantive criminal law that existed before September 1, 1979, the effective date of the Code, survived unless it was inconsistent with the Code. *State v. Bowens,* 205 *N.J.Super.* 548, 552, 501 *A.*2d 577 (App.Div.1985); *N.J.S.A.* 2C:1–1e.

We are satisfied that the Legislature was fully aware of the common law of conspiracy, including the *Stein* decision, and, in enacting *N.J.S.A.* 2C:2–6b(4), it did not clearly evince any purpose to change the established law pertaining to co-conspirator liability. We conclude that established law was the basis for the legislative determination to add subsection 6b(4) to the Code and that the Legislature intended with its adoption of that provision to impose vicarious criminal liability on co-conspirators in light of that decisional law.

## C.

The Appellate Division majority believed that a legal standard for vicarious liability of a co-conspirator for unintended substantive criminal acts beyond the scope of the conspiracy in effect obviates any culpable mental state. The dissent suggests that a standard of such breadth, which eliminates any requirement of culpability, is inconsistent with the Code and would offend due process. See *post* at 476, 628 *A*.2d at 285. The Legislature, however, in fashioning the Code provisions for imposing vicarious liability on a co-conspirator, did not eliminate all requirements of culpability. That is evident from a clear understanding of the standard derived from *Stein* and *Pinkerton* and from other provisions of the Code itself.

The Court in *Stein*, in adopting a rule of vicarious liability based on objective foreseeability, attempted to limit the scope of such foreseeability to consequences that were closely connected with the original conspiracy. The Court in *Stein* considered the case of *State v. Madden*, 61 *N.J.* 377, 294 *A*.2d 609 (1972), in which the defendant, a member of a mob which killed a police officer, was found guilty of murder as a co-conspirator. The majority of the Appellate Division expressed the view that the Court in *Stein* endorsed the reasoning of *Madden*, which sustained the reversal of defendant's conviction based on co-conspirator liability, as standing for the proposition that both vicarious co-conspirator and accomplice liability imposed similar intent elements. 254 *N.J.Su-*

*per.* at 551–52, 604 *A*.2d 131. However, the Court in *Stein* did not consider *Madden* to have dealt directly with the standard for vicarious liability of a co-conspirator because the *Madden* Court found that the evidence of a conspiratorial agreement was lacking. Indeed, contrary to the Appellate Division's interpretation of *Madden* as endorsing the congruity of conspirator and accomplice liability, the *Madden* court found the jury instruction on conspiracy constituted prejudicial error, because of the impropriety of instructing the jury that all defendant are commonly liable with respect to the ensuing substantive offense is inappropriate without evidence of an actual agreement. 61 *N.J.* at 394, 294 *A*.2d 609.

More important, in explaining the *Madden* decision, the Court in *Stein* stated that if the jury instruction given in *Madden* meant that vicarious liability for murder would attach when the co-conspirators agreed to commit *any* crime, that would be inconsistent with "the generally held rule, exemplified by the leading *Pinkerton* case," namely, that a crime committed by one partner in a conspiracy may be attributable to all of the partners provided the act was " 'reasonably foreseen as a necessary or natural consequence of the [conspiracy].' " *Id.* at 388, 294 *A*.2d 609 (quoting *Pinkerton, supra,* 328 *U.S.* at 648, 66 *S.Ct.* at 1184, 90 *L.Ed.* at 1497). The implication of that observation is that such a conspiracy—to commit *any* crime—was so open-ended that the commission of murder could not be reasonably foreseeable as a necessary or natural consequence.

Further, the *Stein* Court's understanding that its standard for imposing liability on a co-conspirator was subject to limitations is reflected in the Court's application of that standard. As earlier noted, the original conspiracy there contemplated a burglary and theft of a household. The Court found that the armed robbery was within the scope of the conspiracy to steal currency from the victim's home. *Stein, supra,* 70 *N.J.* at 389, 360 *A*.2d 347. Moreover, the Court considered the assault on the wife as the robbers entered the home "clearly a foreseeable event in the course of an unlawful invasion of the house for criminal purposes by armed men," and therefore not too remote from the conspiracy

for defendant to be held vicariously liable. *Ibid.* In contrast, the Court found that the defendant was not liable for the kidnapping of the occupants and the ensuing assaults of the pursuing police officers, concluding that, under the circumstances, it would be unreasonable for a fact-finder to find beyond a reasonable doubt that those crimes were necessary or natural consequences of the conspiracy. *Id.* at 390, 360 *A.*2d 347.

*Stein's* practical limitation of the reasonably foreseeable standard is also evident from its reliance on the early case of *People v. Payne*, 359 *Ill.* 246, 194 *N.E.* 539 (1935). The defendant there conspired to commit a robbery. In a role analogous to that of the defendant in *Stein*, the defendant in *Payne* showed the four co-conspirators the targeted house and claimed that its residents kept a large amount of cash on hand. *Id.* 194 *N.E.* at 541. Also, like the defendant in *Stein*, the defendant in *Payne* did not accompany the co-conspirators on the actual robbery and was thus not present when the four murdered the homeowner during the attempt. *Ibid.* The *Payne* court affirmed the defendant's conviction for murder, *id.* 194 *N.E.* at 544, observing that "[i]t might reasonably be anticipated that an attempted robbery would meet with resistance, during which the victim might be shot. . . ." *Ibid.*

The Eleventh Circuit Court of Appeals in *United States v. Alvarez*, 755 *F.*2d 830 (1985), *cert. denied*, 474 *U.S.* 905, 106 *S.Ct.* 274, 88 *L.Ed.*2d 235 (1985), also addressed conspiratorial liability for consequential acts committed outside the originally-intended scope. *Id.* at 850. It applied the *Pinkerton* doctrine to hold that a conspirator may be held responsible for reasonably foreseeable but originally unintended substantive crimes if the relationship between the conspirator and the substantive crime is not too attenuated. *Id.* at 851. There the court affirmed convictions for murder of a federal agent and assault with a deadly weapon rendered against three narcotics conspirators for a homicide and assault committed by other co-conspirators. *Ibid.* The court determined that there was ample evidence to support the jury's conclusion that the murder was a reasonably foreseeable consequence of the drug conspiracy, because the amount of drugs and

money involved in the conspiracy suggested that the conspirators must have been aware of the likelihood that at least some of their co-conspirators would be carrying weapons and that deadly force would be used to protect their interests. Thus, liability would be limited to conspirators who had actual knowledge of at least some of the events and circumstances culminating in the reasonably foreseeable but unintended substantive crime. *Ibid.* Based on the evidence before it, the court held that the relationship between the three conspirators and the murder was not so attenuated as to run afoul of potential due process limitations on the *Pinkerton* doctrine. *Ibid.*

Significantly, the *Stein* case directly addressed the issue of criminal responsibility of a conspirator for the commission of offenses "having some causal connection with the conspiracy but not within the contemplation of the conspirator." *Id.* at 387, 360 A.2d 347. That is the issue in this case. In resolving that issue, *Stein* formulated a standard for vicarious criminal liability of a co-conspirator based on objective foreseeability that is circumscribed by the requirement that the substantive crime be closely connected to the conspiracy. That understanding is consistent with other provisions of the Code that specifically addresses the "causal relationship between conduct and result." *N.J.S.A.* 2C:2–3.

The 1971 Commentary indicates that *N.J.S.A.* 2C:2–3 was adopted, in part, to address the complexity of criminal causation. The conceptual problems of proximate cause had "presented enormously difficult problems because of the vagueness of the term." II *Final Report* at 49. For example, criminal responsibility had depended on "whether or not the injury which caused the death was the regular, natural and likely consequence of defendant's conduct." *State v. Reitze,* 86 *N.J.L.* 407, 92 *A.* 576 (Sup.Ct.1914). Taking a fresh approach, the Code viewed the problem of causality as an aspect or dimension of the culpability required for conviction. II *Final Report* at 49–50. In assessing whether the actor's conduct is the cause of the result, the Code focuses on whether the actual result justly bears on the defendant's culpability for the offense. *State v. Martin,* 119 *N.J.* 2, 11, 573 A.2d 1359 (1990).

Although *N.J.S.A.* 2C:2–3 articulates a range of causal requirements, its essential theme is that the result of criminal conduct be closely connected to that conduct through ties of culpability. Those ties do not demand identical culpable mental states for the criminal conduct and the criminal result. They do require, however, that a result "not be too remote or accidental in its occurrence in relation to the conduct." *N.J.S.A.* 2C:2–3a(2), b, c.

Those Code provisions bear materially on our understanding of the Legislative purpose in adopting co-conspirator liability that is based in part on principles of causation with respect to acts committed beyond the scope of the conspiracy. Thus, in determining the standard for co-conspirator liability intended by the Legislature to be encompassed by the enactment, *N.J.S.A.* 2C:2–6b(4), the Court's decision in *Stein* must be assessed in light of the Legislature's awareness of that decision and the approach it took under the Code with respect to criminal causation. The overarching requirement in determining criminal causation is that the criminal result be closely related to the criminal conduct.

We appreciate the concern of the concurring opinion, *post* at 474–475, 628 *A.*2d at 283–284, that such a standard of vicarious liability for conspirators differs from that of accomplices. Although conspirator liability is circumscribed by the requirement of a close causal connection between the conspiracy and the substantive crime, that standard concededly is less strict than that defining accomplice accountability. It is, however, evident that the Legislature chose to address the special dangers inherent in group activity and therefore intended to include the crime of conspiracy as a distinctive basis for vicarious criminal liability. The legislative history supports the conclusion that the liability for conspirators was intended to be broader than other measures of criminal accountability for vicarious crimes. See discussion, *supra*, at 459, 628 *A.*2d at 276.

Accordingly, we conclude, and now hold, that a co-conspirator may be liable for the commission of substantive criminal acts that are not within the scope of the conspiracy if they are

reasonably foreseeable as the necessary or natural consequences of the conspiracy.

We fully appreciate that the application of a standard based on this holding will be difficult and complicated because it is necessarily fact-sensitive. Consequently, trial courts must endeavor to explain to juries, as part of their instructions, that when determining criminal liability under that standard, they should consider whether the commission of the substantive crime is actually beyond the scope of the original conspiracy, and if so, whether it is objectively foreseeable or reasonably to be anticipated that the substantive crime would be committed in view of the obvious risks surrounding the attempts to execute the conspiracy, and whether the substantive crime occurred or was committed in a manner that was too far removed or too remote from the objectives of the original conspiracy. Those considerations should enable a jury to determine whether the commission of substantive crimes not within the scope of the conspiracy are reasonably foreseeable as the necessary or natural consequences of the conspiracy and constitutes a just basis for imposing criminal liability on a conspirator for the commission of those crimes.

### III

The Appellate Division majority believed that *Stein* required "that the substantive crime [of a co-conspirator] must have been a necessary or natural consequence of the agreement which was reasonably foreseen as such by the conspirator" for vicarious liability to apply to a defendant-conspirator. 254 *N.J.Super.* at 555, 604 *A.*2d 131. The majority hence concluded that even if *Stein* still did define the parameters of co-conspirator liability pursuant to *N.J.S.A.* 2C:2–6b(4), Bridges could not be convicted for murder. *Id.* at 556, 604 *A.*2d 131. According to the majority, Bridges could have foreseen that Bing or Rolle would recklessly fire their handguns, but could not have foreseen that one of the two co-defendants "would either purposely or knowingly cause death or serious injury" to any of the partygoers. *Ibid.* The

dissent, on the other hand, disagreed with the majority's view that Bridges could not have reasonably foreseen that using handguns to intimidate a hostile crowd at 2 a.m. would lead to the purposeful shooting and ultimate death of one of the partygoers. *Id.* at 569–70, 604 *A.*2d 131.

The trial court instructed the jury to use the "natural or probable consequence" language that the majority rejected. The charge was thus broadly consistent with the standard as expressed in *Stein.* However, that charge did not sufficiently inform the jury in accordance with the standard that we now prescribe and that should govern the jury's determination of criminal liability.

■ Under our holding a conspirator can be held liable for the acts of others that constitute a reasonably foreseeable risk arising out of the criminal conduct undertaken to effectuate the conspiracy, and occurring as the necessary or natural consequences of the conspiracy. The substantive crime must be reasonably and closely connected to the conspiracy even though those crimes may not have been within the actual contemplation of the conspirators or within the scope of the conspiracy as originally planned. The jury instruction did not sufficiently present that standard to the jury or the kind of considerations that would be helpful in guiding its deliberations.

■ The question remains whether the evidence would fairly permit a jury to determine beyond a reasonable doubt that defendant is guilty of the substantive crime of murder based on his participation in the conspiracy.

The jury found beyond a reasonable doubt that Bridges had conspired with Bing and Rolle to commit fourth-degree aggravated assault, possess firearms for an unlawful purpose, and possess firearms without a permit. The facts show that after an argument at a party, Bridges angrily threatened those at the party that he was going to retrieve his companions from Trenton. Bridges in fact did travel from Roebling to Trenton and back, returning to the party at 2 a.m. Further, Bridges knew that his cohorts, acquaintances Bing and Rolle, had loaded guns, and even admitted

to thinking the guns were necessary. In light of those facts, the jury does not appear to have unreasonably convicted on the fourth-degree aggravated-assault and weapons charges, because those substantive crimes were the direct object of the conspiracy.

The conspiracy did not have as its objective the purposeful killing of another person. Nevertheless, the evidence discloses that the conspiratorial plan contemplated bringing loaded guns to keep a large contingent of young hostile partygoers back from a beating of one of their friends, and that it could be anticipated that the weapon might be fired at the crowd. Also inferable from the evidence is that hostilities might escalate in the course of carrying out that conspiracy. Thus, defendant traveled far and wide to find people on the streets of Trenton at 12:30 a.m. who would back him up in his fight. And Bridges did not balk when the co-conspirators retrieved loaded guns. Further, in the course of carrying out the conspiracy, just prior to Bridges' street fight at the scene, Rolle warned the crowd that "Nobody here is Superman," which was thought to imply that nobody in the hostile crowd could stop a bullet. Yet, Bridges did not back off of his intention to "fuck somebody up."

From that evidence a jury could conclude that a reasonably foreseeable risk and a probable and natural consequence of carrying out a plan to intimidate the crowd by using loaded guns would be that one of the gunslingers would intentionally fire at somebody, and, under the circumstances, that act would be sufficiently connected to the original conspirational plan to provide a just basis for a determination of guilt for that substantive crime.

## IV

The judgment of the Appellate Division is affirmed in part, reversed in part, and the matter is remanded.

O'HERN, J., concurring in part and dissenting in part.

I concur in the judgment of the Court. However, I disagree with its opinion primarily for the reasons stated in the opinion of

the Appellate Division. I add only the following observations concerning the issues.

## I

An interpretation of the provisions of the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to :98–4 (the Code), that would allow a sentence of life imprisonment to be imposed on the basis of the negligent appraisal of a risk that another would commit a homicide, conflicts with the internal structure of the Code. Despite the fact that "[c]ommon law crimes are abolished [by the Code] and no conduct constitutes an offense unless the offense is defined by this code or another statute of this State," *N.J.S.A.* 2C:1–5a, the Court has incorporated within its analysis concepts drawn from the common law of crimes. *Ante* at 453–457, 628 *A.*2d at 273–275. The common law had a deep distrust of criminal combinations. Group activity was seen as posing a "greater potential threat to the public than individual delicts." *Callanan v. United States,* 364 *U.S.* 587, 593, 81 *S.Ct.* 321, 325, 5 *L.Ed.*2d 312, 317 (1961). "For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws [was considered] an offense of the gravest character, sometimes quite outweighing, in injury to the public, the *mere* commission of the contemplated crime." *United States v. Rabinowich,* 238 *U.S.* 78, 88, 35 *S.Ct.* 682, 685, 59 *L.Ed.* 1211, 1215 (1915) (emphasis added). It was as though a conspiracy to injure were worse than the harm itself. Why should this be so? Justice Holmes once reminded us that "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L.Ed.* 963, 983 (1921).

An obsession of English judges with the fear of political conspiracy gave the crime of conspiracy a "chameleon-like" life of its own. *See Krulewitch v. United States,* 336 *U.S.* 440, 447, 69 *S.Ct.* 716, 719, 93 *L.Ed.* 790, 796 (1949) (Jackson, J., concurring). Having its origin in Star Chamber practices, "The crime comes down to us wrapped in vague but unpleasant connotations. It sounds histori-

cal undertones of treachery, secret plotting and violence on a scale that menaces social stability and the security of the state itself." *Id.* at 448, 69 *S.Ct.* at 720, 93 *L.Ed.*2d at 796 (Jackson, J., concurring). Yet it is often trivialized by application to ones such as Krulewitch, a panderer found in conspiracy with his prostitute. Still today, as in this Court's decision, "[i]ts history exemplifies the 'tendency of a principle to expand itself to the limit of its logic.'" *Id.* at 445, 69 *S.Ct.* at 719, 93 *L.Ed.*2d at 795 (Jackson, J., concurring) (quoting Cardozo, *Nature of Judicial Process* 51). The Court now gives the crime one of the most unusual and illogical twists in its long history.

The law of conspiracy serves two independent values. The first is the protection of society from the danger of concerted criminal activity. The second is the protection of society from inchoate or uncompleted crimes.

> This is to say, that, although the law generally makes criminal only antisocial conduct, at some point in the continuum between preparation and consummation, the likelihood of a commission of an act is sufficiently great and the criminal intent sufficiently well formed to justify the intervention of the criminal law.

[*United States v. Feola*, 420 *U.S.* 671, 694, 95 *S.Ct.* 1255, 1268, 43 *L.Ed.*2d 541, 558 (1975).]

For that reason, conspiracy is grouped under our Code, in Chapter 5, with other uncompleted or inchoate crimes such as attempt. Because the intervention of the law before an act occurs implicates special concerns, the Code requires that the actor have the purpose to cause the result. Thus, for example, in the case of attempted murder, a preparatory crime the same as conspiracy to commit murder, the Code requires:

> Although an actor may be guilty of murder if he or she intended to kill or was practically certain that his or her actions would cause or would be likely to cause death, the actor is guilty of attempted murder *only* if he or she actually intended the result, namely, death, to occur. Thus, the Code requires that to be guilty of attempted murder, a defendant must have purposely intended to cause the particular result that is the necessary element of the underlying offense—death.

[*State v. Rhett*, 127 *N.J.* 3, 7, 601 *A.*2d
689 (1992) (emphasis added).]

As the Court recently noted, "An attempt is purposeful 'not only because it is so defined by statute, but because one cannot logically attempt to cause a particular result unless causing that result is one's 'conscious object,' the distinguishing feature of a purposeful mental state. *N.J.S.A.* 2C:2–2(b)(1).'" *State v. McCoy*, 116 *N.J.* 293, 304, 561 *A.*2d 582 (1989) (quoting *State v. McAllister*, 211 *N.J.Super.* 355, 362, 511 *A.*2d 1216 (App.Div. 1986)). If we assume, as the majority does, *ante* at 449–451, 628 *A.*2d at 271–272, that Bridges did not intend that Shawn Lockley be killed, he could not have been convicted of attempted murder.

Nor could defendant have been convicted as an accomplice to the murder. "Because of a moral intuition about holding one accountable for the wrongdoing of another the extent of accomplice liability has been defined carefully in our Code of Criminal Justice." *State v. Weeks*, 107 *N.J.* 396, 401, 526 *A.*2d 1077 (1987) (citation omitted). Under the Code, "By definition an accomplice must be a person who acts with the *purpose* of promoting or facilitating the commission of *the* substantive offense for which he is charged as an accomplice." *State v. White*, 98 *N.J.* 122, 129, 484 *A.*2d 691 (1984) (holding that for accomplice liability to be imposed under Graves Act, defendant must have shared accomplice's intent to use or carry gun in commission of offense).

And finally, defendant could not even have been found guilty of conspiracy to commit murder. A person is guilty of a conspiracy to commit an offense only if "*with the purpose* of promoting or facilitating its commission he" or she agrees with another person that they will "engage in conduct which constitutes such crime" or agrees to aid such person "in the planning or commission of such crime." *N.J.S.A.* 2C:5–2a (emphasis added).

The Court concludes that defendant may be held accountable for the offense of murder without sharing any intent to murder, primarily in reliance on a memorandum of the minutes of the

November 14, 1974, meeting of the Assembly Judiciary, Law, Public Safety and Defense Committee, revealing that the Office of the Attorney General objected to departure from the common-law principles of liability as set forth in *Pinkerton v. United States,* 328 *U.S.* 640, 66 *S.Ct.* 1180, 90 *L.Ed.* 1489 (1946). *Ante* at 458–459, 628 *A.*2d at 275–276. Thereafter, the Legislature added a section to the Code's provisions on "Liability for the conduct of another; complicity," *N.J.S.A.* 2C:2–6, to include one who is "engaged in a conspiracy with such other person." *N.J.S.A.* 2C:2–6b(4). The Code gives no further guidance concerning scope or meaning of that provision. On another occasion, Justice Handler reminded us that such isolated drafting changes to the Code sometimes "bespeaks inadvertence rather than deliberation." *See State v. Rose,* 112 *N.J.* 454, 567, 548 *A.*2d 1058 (1988) (Handler, J., dissenting). In this aspect, as in so many other aspects of mid-course corrections to the Code, I believe that we should give the Code an interpretation that is consistent with its overall structure. We have regularly done that. When Code provisions appear to produce a result inconsistent with the overall structure of the Code, we normally give the provision a meaning that furthers the general purposes of the Code. *See State v. Bridges (Dwight),* 131 *N.J.* 402, 414, 621 *A.*2d 1 (1993) (noting that " '[l]ack of precision in drafting does not mandate lack of common sense in construction' " (quoting *State v. Des Marets,* 92 *N.J.* 62, 78, 455 *A.*2d 1074 (1983))); *State v. Valentin,* 105 *N.J.* 14, 20–21, 519 *A.*2d 322 (1987) (noting that Court's job in construing statutes is to make sense of whole of statute insofar as possible and not to construe individual sections in isolation).

The Appellate Division gave *N.J.S.A.* 2C:2–6b(4) an interpretation that is consistent with the whole of the Code structure, that is, recognizing the *Pinkerton* doctrine as a form of accomplice liability. Justice Jackson, who did not participate in *Pinkerton,* noted that the *Pinkerton* holding sustained a conviction of a substantive offense when the record contained no proof of participation in or knowledge of it, on the "theory that conspiracy is equivalent in law to aiding and abetting." *Krulewitch, supra,* 336

*U.S.* at 451, 69 *S.Ct.* at 722, 93 *L.Ed.* at 798 (Jackson, J., concurring). Under our law, an aider and abettor is treated as an accomplice. *N.J.S.A.* 2C:2–6c(1)(b). To convict an accomplice of a substantive offense, the accomplice must share the criminal purpose of the actor. *N.J.S.A.* 2C:2–6c(1).

The Code establishes a carefully-measured grid of criminal responsibility.

> It is well to remember that in making "a clean break with the past," the Code defines crimes to match criminal conduct more precisely than did pre-Code law. *See State v. Mirault,* 92 *N.J.* 492, 496 [457 *A.*2d 455] (1983). It presents a complete and carefully structured system that fits punishments to the crimes committed. [*State v. Williams,* 197 *N.J.Super.* 127, 133, 484 *A.*2d 331 (App.Div.1984), *certif. denied,* 99 *N.J.* 233, 491 *A.*2d 722 (1985).]

Thus, one who causes the death of another with the knowledge or purpose to kill will be guilty of murder and can be sentenced to death in certain circumstances or to life imprisonment with a minimum of thirty years without parole. In the case of felony-murder, at least at common law, the intent to commit the underlying crime, such as robbery or rape, was constructively transferred to the death of the victim, although "[m]ore recently, felony murder has been viewed * * * as a crime * * * of absolute or strict liability." *State v. Martin,* 119 *N.J.* 2, 20, 573 *A.*2d 1359 (1990).

The manslaughter offenses require a finding that an actor causing death has exhibited a reckless disregard for human life. When that recklessness is in disregard of a *probability* that death may occur, the offense is aggravated manslaughter and carries a penalty of up to thirty years in prison. When the proof shows reckless disregard of a possibility of causing death, the offense is reckless manslaughter and carries the penalty of a first-degree crime, up to twenty years in prison. Except for one form of vehicular homicide, *N.J.S.A.* 2C:11–4b(3), *no negligent homicide* exists under New Jersey law, much less a crime of negligent murder.

In describing the purposes of the Code, Dean Robert E. Knowlton explained that one of its main goals was "to achieve greater

individual justice through a closer relation between guilt and culpability, requiring workable definitions of the various culpability factors." *Comments Upon The New Jersey Penal Code*, 32 *Rutgers L.Rev.* 1, 2 (1979). (He did note that the legislative change making one person liable for the conduct of another when both are engaged in a conspiracy posed "dangers [that] are obvious." *Id.* at 7.) The Court has contradicted those principles of justice by making one such as defendant more likely to be found guilty of murder than one charged as an actual conspirator, or as an accomplice to murder, or even as one who attempted murder. In each of those cases, one would have to intend the killing to be convicted of murder. The members of a criminal combination can be prosecuted under one of three theories: as a principal in the crime, as an accomplice to the crime, or as one who conspired to commit the crime. *State v. Schmidt*, 110 *N.J.* 258, 264, 540 *A.2d* 1256 (1988). Most often, the conspirator's act will be further removed in time from the criminal act than that of the principal or accomplice. Yet the Court penalizes the conspirator more severely than the principal or accomplice, each of whom would have to have a specific intent, at least knowledge, and in the case of an accomplice, the actual purpose to commit the completed crime. The Court thereby dismantles the carefully-crafted principles of cases such as *White, supra*, 98 *N.J.* 122, 484 *A.2d* 691, which held that to convict an accomplice of a Graves Act offense, the accomplice would have to have shared the principal's purpose to use a gun in the commission of a crime.

In a long series of cases, we have attempted to seek rational and proportional punishment for crimes. *See, e.g., State v. Towey*, 114 *N.J.* 69, 552 *A.2d* 994 (1989) (requiring that sentences be internally consistent); *State v. Kruse*, 105 *N.J.* 354, 362, 521 *A.2d* 836 (1987) (stating that need for uniformity in sentencing will rarely allow court to "impose a period of parole ineligibility while also imposing the presumptive sentence"). This case is an example of the most extreme sort—life imprisonment with no possibility of parole for thirty years on the basis of a negligent mental state. The *Pinkerton*-type rule accepted by the Court " 'may implicate a

person, on the basis of negligence or stupidity, in very serious offenses which he never contemplated or agreed, expressly or by implication, to have perpetrated.'" Note, Peter Buscemi, *Conspiracy: Statutory Reform Since The Model Penal Code*, 75 *Colum.L.Rev.* 1122, 1152 (1975) (quoting Louis B. Schwartz, *The Proposed Federal Criminal Code: The Administration Bill* 11 (1973)). Even a felony-murderer can assert in most circumstances the subjective defense that he "[h]ad no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury." *N.J.S.A.* 2C:11–3a(3)(d).

## II

Although the Court believes that it is bound to accept the foregoing interpretation, I do not believe that it can do so without offending the principles of the *Pinkerton* doctrine itself. To begin with, to find that murder was in furtherance of the conspiracy, alleged here in Count One, to carry weapons and to point weapons and to threaten people with weapons is a logical impossibility. This was not a case in which conspirators in a drug transaction killed federal agents to further their conspiracy by escaping detection. *United States v. Alvarez*, 755 *F.*2d 830 (11th Cir.), *cert. denied sub nom. Hernandez v. United States*, 474 *U.S.* 905, 106 *S.Ct.* 274, 88 *L.Ed.*2d 235 (1985), and *cert. denied sub nom. Portal v. United States*, 482 *U.S.* 908, 107 *S.Ct.* 2489, 96 *L.Ed.*2d 380 (1987). No one kills to further a plan to frighten others. *See State v. Darby*, 200 *N.J.Super.* 327, 331, 491 *A.*2d 733 (App.Div. 1984) (explaining that "'Attempted felony murder' is a self-contradiction, for one does not 'attempt' an unintended result."), *certif. denied*, 101 *N.J.* 226, 501 *A.*2d 905 (1985).

The Court has suggested instructions, *ante* at 466–467, 628 *A.*2d at 279–280, that will narrow the scope of such conspirator liability but the instructions still fail to require the jury to find an essential element of *Pinkerton* liability. The *Pinkerton* doctrine is a judicially-created doctrine that makes each member of a conspiracy liable for crimes that other members commit to further the joint

criminal enterprise. *Nye & Nissen v. United States,* 336 *U.S.* 613, 618, 69 *S.Ct.* 766, 769, 93 *L.Ed.* 919, 925 (1949), summarized *Pinkerton* as holding that

> a conspirator could be held guilty of the substantive offense even though he did no more than join the conspiracy, provided that the substantive offense was committed in furtherance of the conspiracy and as a part of it. A verdict on that theory requires submission of those fact issues to the jury.

The Court's suggested instructions can be read as not requiring the jury to find the essential requirement of *Pinkerton* that the substantive offense was committed in furtherance of the conspiracy. Although the *Pinkerton* doctrine allows as a matter of course that all crimes committed in the furtherance of a conspiracy may be attributed to all co-conspirators, it provides an exception to that normal rule if an act done in furtherance of a conspiracy could not have been reasonably foreseen as a necessary and natural consequence of the conspiracy. *Pinkerton, supra,* 328 *U.S.* at 646–47, 66 *S.Ct.* at 1183–84, 90 *L.Ed.* at 1496–97. The suggested instructions can be read as swallowing up the *Pinkerton* exception and converting it into a substitute predicate for liability, namely, that an act not done in furtherance of the conspiracy can become an act of the conspiracy if it is foreseeable. The Court has done its best to salvage a rather undetailed effort by drafters and revisers of the Code to fit conspirator's liability into the Code. It may have inadvertently created greater potential for trial error.

"At the heart of the guarantee of a fair trial is the 'jury's impartial deliberations upon the guilt of a criminal defendant based solely upon the evidence in accordance with proper and adequate instructions * * *.' " *State v. Collier,* 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982) (quoting *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979)). We emphasize that charges should be tailored to the facts of a case. *State v. Concepcion,* 111 *N.J.* 373, 379–80, 545 *A.*2d 119 (1988). A proper charge under *N.J.S.A.* 2C:2–6 requires a court to explain the meaning of liability for another's act when the actor is "engaged in a conspiracy with such other person." *N.J.S.A.* 2C:2–6b(4). But what conspiracy? We have no common law crime of conspiracy, only a statutory crime of conspiracy when

with the purpose of promoting or facilitating *its* commission [an actor]:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

[*N.J.S.A.* 2C:5-2a (emphasis added).]

At a minimum, constitutional guarantees to a fair trial require that the statutory elements of this offense be charged to the jury. A jury must be instructed that the State has the burden of proving beyond a reasonable doubt that the murder committed by Bing and Rolle was pursuant to the conspiracy in Count I to carry a weapon unlawfully or to threaten another with the weapon. I agree with the Appellate Division that the evidence fell measurably short of allowing such a finding, but at least the jury must be asked to make the finding.[1] *State v. Stein,* 70 *N.J.* 369, 360 *A.2d* 347 (1976), does not (and cannot) dispense with these essentials.

---

[1] An example of a minimally-appropriate *Pinkerton* charge is found in *Alvarez, supra,* involving a drug conspiracy with the attendant murder of federal agents. The jury was instructed:

If you find that a particular defendant is guilty of conspiracy as charged in Count I of the indictment [the drug indictment], you may also find the defendant *guilty of either* murder as charged in Count III of the indictment or assault as charged in Count IV of the indictment, or both, provided you find the essential elements of murder or assault or both as defined in these instructions have been established beyond a reasonable doubt; and provided you also find *beyond a reasonable doubt:*

First, that the murder or assault or both were committed pursuant to the conspiracy;

Second, that the murder or assault or both were reasonably foreseeable consequences of the [drug] conspiracy alleged in Count I; and

Three, that the particular defendant was a member of the conspiracy at the time of the murder or assault or both was committed.

Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the murder or assault or both.

The reason for this is that a coconspirator committing a substantive offense *pursuant to a conspiracy* is held to be the agent of other conspirators as to acts which are reasonably foreseeable. [755 *F.2d* at 848 n. 22 (emphasis added).]

It cites *Pinkerton* with approval. *Stein* assumes that the assault and kidnapping of the victim were committed by actors *pursuant* to the conspiracy to commit burglary and concerned itself with what it perceived to be a misapplication of *State v. Madden,* 61 *N.J.* 377, 294 *A.*2d 609 (1972), a case that dealt with an absence of sufficient evidence of a conspiracy.

I am convinced that the Legislature would never intend that one be sentenced to prison for life as a convicted murderer on the basis of a "negligence" standard. With certain exceptions for motor-vehicle accidents, negligence will not even sustain a conviction of reckless manslaughter. The most reasonable construction of *N.J.S.A.* 2C:2–6b(4) is that the Legislature intended that the conspirator to the commission of an offense, like an accomplice to the commission of an offense, be punished as a principal. The model jury charge on *N.J.S.A.* 2C:2–6b(4) incorporates that understanding, *i.e.*, that only liability for the completed crimes that were the objects of the conspiracy is intended under *N.J.S.A.* 2C:2–6b(4). The model charge states in part: "the State alleges that the crime of _____ was committed by _____, and that the defendant is legally accountable for the crime of _____ committed by _____ because the defendant and _____ allegedly conspired to commit *that crime.*" (Emphasis added.) Later the charge reads: "Thus, you must decide whether the defendant engaged in a conspiracy with _____ to commit the crime of _____." Finally, it states: "In this case, after consideration of all of the evidence if you find beyond a reasonable doubt that _____ committed the crime of _____ and also that the defendant conspired with _____ to commit that crime, then you must find the defendant Guilty of the crime of _____." No liability is foreseen by that charge, drawn by a committee of judges and lawyers appointed by the Court, other than for the crime or crimes that were the object of the conspiracy.

### III

In its long history, the crime of conspiracy has taken many bizarre turns. As noted, at one time the law punished conspiracy

to commit an offense more severely than the completed offense. Of course, we no longer do that. In a case involving a completed offense, the conspiracy merges into the completed offense and is punished as is that offense. *N.J.S.A.* 2C:1–8a(2).

Somewhat like the English judges did, the Court now punishes one who has no intent to kill more severely than one who was practically certain to kill. *See Rhett, supra*, 127 *N.J.* 3, 601 *A.2d* 689 (holding that *purpose* to kill is required to convict one of attempted murder). To demonstrate the utter illogic of that holding, we need only pose the example of two conspiracies with single objectives: one to kill, the other to trade in counterfeit antiques. In the former case, an alleged conspirator could be guilty of murder or conspiracy to commit murder only if he or she shared the *purpose* to kill, *N.J.S.A.* 2C:5–2a; in the latter case, a conspirator in the antique scam could be found guilty of murder if he or she did not foresee that a confederate might go berserk in a heated discussion with a customer and kill the customer.

*For affirmance in part; reversal in part; and remandment*— Chief Justice WILENTZ and Justices HANDLER, CLIFFORD, POLLOCK, and GARIBALDI—5.

*Concur in part; dissent in part*—Justices O'HERN and STEIN—2.